**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br>v.<br>CLEVERLINK TRADING LIMITED, *et al.*<br>Defendants. | Case No. 05C 2889<br>Judge Amy J. St. Eve<br>Magistrate Judge Jeffrey Cole |

**REPORT OF MONITOR**

Michael G. Rhodes, Court appointed Monitor pursuant to Section VII.E of the Stipulated Preliminary Injunction order entered by the Court on June 29, 2005 ("Injunction"), hereby submits the following initial report ("Report"). Copies of the Report are being provided to counsel for the plaintiff Federal Trade Commission ("FTC"), and defendants Cleverlink Trading Limited, Real World Media, LLC, Brian D. Muir, Jesse Goldberg, and Caleb Wolf Wickman ("Defendants"), with the instruction that counsel for the FTC file the Report with the Court.

**1.** Subsequent to the Court's Order appointing the Monitor, and after having reviewed various pleadings in this action, including the complaint and pleadings relating to the stipulated preliminary injunction, I met and conferred with both sides' counsel via telephonic conference.

**2.** I thereafter met for several hours with counsel for the FTC in my offices on August 12, 2005. Counsel for the FTC presented their arguments as to what they believed the evidence gathered to date showed, what discovery would likely entail and reveal, and explained their basic understanding of the manner in which Defendant operated the web sites in question,

particularly as it related to the use of so-called spam email to drive traffic to the web sites where users could subscribe to the services offered on such sites. Counsel for the FTC left for my perusal various written materials that included correspondence between the parties' attorneys and associated financial and overview reports from Defendants.

**3.** I then met with counsel for the Defendants at my office on August 17, 2005. The main thrust of this meeting was to confirm my basic understanding of the manner in which the Defendants' affiliate programs operated from the standpoint of how spam drove traffic to their controlled and/or operated websites. We also explored extensively the trail of money that led into and out of the Defendants' controlled and/or operated websites. As did counsel for the FTC, Defendants' counsel left with me a binder of written materials that I was asked to review after the meeting (much of which I had requested prior to the meeting).

**4.** Following these meetings, I reviewed the written materials that had been provided to me from counsel for the parties, and continued to ask questions of and request information from counsel for the Defendants. I generally have been provided in a timely and responsive manner all of the information I have requested of Defendants through counsel, subject to the caveats expressed below.

**5.** In view of my commitment to the parties that I would act as Monitor in a cost effective manner, I have not made specific findings of fact in connection with the discharge of my mandate as specified in Section VII of the Injunction. Rather, I have attempted to confirm whether there is probable cause (that is, a prima facie showing using a preponderance of evidence standard) to believe that Defendants are in compliance with all aspects of the Injunction.

**6.** In making this determination, I have relied upon the truth and accuracy of all of the information provided to me by counsel for the parties. I assume, therefore, that there are no material errors, inaccuracies or omissions in any of the materials heretofore provided to me by counsel, and I further assume that counsel's representations to me about the accuracy and truthfulness of the information provided reflects and evinces the Defendants' certification that all

information provided is truthful, accurate and without omission in all material respects. Accordingly, any subsequent discovery that there are material errors, inaccuracies or omissions in such information could potentially undercut the validity of the conclusions reached herein.

**7.** Based on the specific assurances made to me by counsel for Defendants, and in light of any evidence to the contrary, it is my conclusion that Defendants are in compliance with Sections 1 through VI, inclusive, of the Injunction. In this respect, I have relied explicitly on (among other things and without limitation) the information set forth in Defendants' counsel's letter to me dated August 30, 2005 and the statements and assurances made therein. I have also relied on express representations of Defendants' counsel that the Cleverlink affiliate program currently is disabled and will not be reactivated without the protections outlined in his letter dated August 30, 2005 and that the affiliate programs pertaining to Crazy Protocol and Real World have never generated historical spam complaints from more than 1-2% of the registered users of the web sites operated or controlled by those two entities.

**8.** That leaves for analysis Sections VII through XII of the Injunction. Initially, Defendants presented financial data and reports to me in a relatively crude form. This is probably not unexpected given the relative business inexperience of the three individual defendants. The central question I continued to pose was, what happened to the $3.3 million of top-line revenue reported by Cleverlink? The documents provided did not tell the composite tale in a clear and easy-to-understand manner. Ultimately, on September 9, 2005 at my offices, I met with the Cleverlink bookkeeper, Ms. Sheila Wickman (who happens to be the mother of defendant Caleb Wolf Wickman).

**9.** At this meeting, Defendants' counsel and Ms. Wickman outlined the somewhat convoluted corporate structure of Cleverlink. Cleverlink is a business entity registered under the laws of Cyprus. Listed as the shareholders of Cleverlink as of January 5, 2005, are defendant Goldberg (1/3 of the shares), Southserve Trading Limited (1/3 of the shares) and Dalsen Limited (1/3 of the shares). Southserve Trading shows defendant Brian Muir and Marinos Gavriel as its two directors. Dalsen Limited remains somewhat of a mystery to me. Defendants and their

counsel have not provided an adequate explanation of who Mr. Gavriel is or how he fits into the Cleverlink landscape beyond the blanket statement that he was a corporate functionary necessary to establish Cleverlink as a Cypriot business entity. Dalsen is apparently registered as a business entity in Belize, but again I have not been provided with any real explanation of what this entity is or how it came to be part of the Cleverlink structure.

**10.** Without going into all of the facets of the Cleverlink money trail, suffice it to say that the money generated from Cleverlink's activities ultimately passes through (once expenses have been paid, the single largest line item of which is the Cleverlink affiliate program) the intermediary entities of Online Marketing, Real World and Crazy Protocol before ending up in the hands of the individual defendants. For simplicity, Defendants prepared at my request a one-page summary of cash flows pertaining to Cleverlink, and I annex that document hereto as Exhibit A. Accepting Ms. Wickman's certification that the document is a true and correct statement of such cash flows, Exhibit A accounts for all of the cash generated to date by Cleverlink's activities, and thus suggests that there are no financial assets that need to be repatriated as contemplated by Section IX of the Injunction. Thus, I can make no specific conclusion about Defendants' compliance with Section IX beyond noting that it appears inapt in view of Defendants' certification that there are no foreign assets to repatriate.

**11.** Based on the agreements that appear to have been worked out directly between counsel for the FTC and Defendants (and using as an example the manner in which they were able to work out a tax payment due on August 30, 2005 from Mr. Muir), I have concluded that there is probable cause to believe that Defendants are in compliance with the provisions of Section VII of the Injunction.

**12.** Neither party has brought to my attention any effort by Defendants (or the other persons covered by the terms of the Injunction) to engage in new ventures of the type covered by Section XI of the Injunction and, accordingly, I have made no conclusion with respect to the provisions thereof.

**14.** Pursuant to Section VII, F, of the Injunction (supplemented by my letter to counsel for the parties dated July 6, 2005 in which I agreed to cap my fees at $50,000), I received a $10,000 retainer which my law firm is holding against final billings. Through September 12, 2005, total fees incurred are $13,343.75 and total costs incurred are $159.10. Bills are being sent to counsel for Defendants and I have asked that he see that they are timely paid by Defendants. Upon confirmation from the parties or the Court that my duties are completed, I will prepare a final reconciliation and issue a check for any credit balance to counsel for Defendants.

Respectfully submitted this 14th day of September, 2005.

COURT APPOINTED MONITOR:

Michael G. Rhodes
COOLEY GODWARD LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Tel: (858) 550-6017
Fax: (858) 550-6420

**Cleverlink - Analysis for Monitor -- September 13, 2005**

| | |
|---|---|
| Total Sales | $3,307,002.41 |
| Affiliate Payout / Referral Fees | (1,707,471.00)[1] |
| Hosting / Tech & Customer Support / Content | (355,312.84) |
| Uncollectibles / Reserves | (665,203.94) |
| Bookkeeper / Professional Fees | (78,391.03) |
| Net Revenues | $ 500,623.60 |
| Payments to Crazy Protocol | |
| -- Distribution | (108,950.00) |
| -- Referral Fees | (71,833.37) |
| Payments to Online Marketing[2] | |
| -- Distribution | (217,900.00) |
| -- Referral Fees | (31,990.00) |
| -- Reimbursed Affiliate Payouts | (63,552.00) |
| -- Other Reimbursed Expenses | (17,064.70) |
| | (10,666.47) |

I, Sheila Wickman, certify that, to the best of my knowledge, the above is materially true and correct.

Sheila Wickman

1 This does not include the $63,552 that was paid by Cleverlink to Online Marketing Productions (OMP) as a reimbursement for affiliate payouts advanced by OMP.

2 Amounts received by OMP for distribution and referral fees were subsequently paid to Real World and then were available for distribution to WCID and CWWD in equal proportion.

{00073212;1}

**EXHIBIT A**