Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 05 C 2889 | **DATE** | 1/11/2006 |
| **CASE TITLE** | FTC vs. Cleverlink | | |

**DOCKET ENTRY TEXT**

FTC's motion to preserve assets and for rule to show cause as to why third party Oceanic should not be held in contempt of court is granted in part.  The Court directs Oceanic to submit briefing and supporting evidence on or before January 27, 2006 explaining why the Court should not find Oceanic in civil contempt.  As part of that briefing, the Court orders Oceanic to submit the jurisdictional proffer described in this order.  The Court further orders Oceanic not to dissipate the remaining funds in its possession that it may be holding on Cleverlink's behalf.   The Court reserves ruling on the FTC's request for a full accounting until it determines whether it has personal jurisdiction over Oceanic.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

        Plaintiff Federal Trade Commission (the "FTC") has submitted a motion (the "Motion")  to preserve assets and for rule to show cause as to why third party Oceanic Telecommunications Services, LLC ("Oceanic") should not be held in contempt of court.  In addition, the FTC seeks an order freezing the Oceanic savings account containing the non-dissipated funds of Defendant Cleverlink Trading Limited ("Cleverlink"), and a full accounting of all funds that Oceanic has had in its possession concerning consumer credit card transactions relating to Cleverlink.  For the reasons state below, the Court grants the FTC's motion in part.

### BACKGROUND

        On May 16, 2005, the FTC filed suit against Cleverlink (and other defendants) alleging that Cleverlink is liable under Sections 13(b) and 19 of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 57(b), and Section 7(a) of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act"), 15 U.S.C. §7706(a).  That same day, the Court granted the FTC's *ex parte* motion for a Temporary Restraining Order.  (R. 11-1, Temporary Restraining Order; R. 15-1, Modified Temporary Restraining Order issued May 27, 2005 ("TRO").)  On June 16, 2005, representatives of Cleverlink executed sworn financial statements indicating that Oceanic – an entity that processed consumer credit card charges for Cleverlink during March 2005 – possessed roughly $370,000 of Cleverlink funds.  (R. 48-1, FTC's Motion, Ex. C.)  On June 28, 2005, the FTC served Oceanic with a copy of the Court's TRO. (*Id.*, Ex. A.)

        On June 29, 2005, the FTC and Defendants (all represented by counsel) agreed upon the terms of a Stipulated Preliminary Injunction.  (R. 30-1, Stipulated Preliminary Injunction.)  As is relevant here, the injunction provides that:

# STATEMENT

A.  Defendants, whether acting directly or through a trust, corporation, subsidiary, division, or other device, or any of them, are hereby preliminarily restrained and enjoined from, directly or indirectly, transferring, converting, encumbering, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, perfecting a security interest in, or otherwise disposing of any assets wherever located, inside or outside of the United States of America, that are:

1.  owned or controlled by, or held, in whole or in part, for the benefit of, or subject to access by, or belonging to, and Defendant; or

2.  in the actual or constructive possession of, or owned or controlled by, or subject to access by, or belonging to, any corporation, partnership, trust or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Defendant.

*     *     *

D.  Upon being served with a copy of this Order, notwithstanding anything in Section X of the Order, Oceanic Telecommunications Services, LLC, 830 Bear Tavern Road, Trenton, NJ 08628, shall hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversation, sale or other disposal of any account or asset of, or held on the behalf of, any Defendant, including Cleverlink Trading Limited, unless authorized in writing by the Court or counsel for the FTC.

(*Id.* at 16-17.)  The Court issued the stipulated injunction on June 29, 2005.  (*Id.*)  The FTC served the preliminary injunction on Oceanic on June 30, 2005.  (R. 48-1, FTC's Motion, Ex. B.)

After serving the preliminary injunction, the FTC requested that Oceanic provide an accounting of all of the funds it possessed on Cleverlink's behalf.  (*Id.* at ¶5.)  In a letter to the FTC, Oceanic's counsel stated:

On or about April 20, 2005, because of excessive charge backs and other indicia of fraud, Cleverlink['s] . . . bank, BanKard ceased transmitting funds to Oceanic and instructed Oceanic to transmit no further funds to Cleverlink . . .  The amount of funds held by BanKard as of the time the processing of Cleverlink transactions stopped was $236,463.37.  The amount held by Oceanic pursuant to BanKard's instructions was $352,126.55.  The total amount of funds held by BanKard and Oceanic thus totaled $588,589.92.  This amount was held in order to setoff against [certain] charges, fines and expenses which have been or will be incurred . . .

(*Id.*, Ex. C.)

Subsequently, Cleverlink's counsel submitted the certification of Colin Sholes, Oceanic's "primary officer" and an individual purporting to have knowledge concerning Oceanic's business and bookkeeping practices.  (*Id.*, Ex. D.)  In addition to the above representations, Mr. Sholes stated:

Chargebacks of Cleverlink transactions continue to occur after April 20, 2005 and, as a result of such chargebacks, chargeback and multi-factoring fines were imposed against Cleverlink.  The fines were imposed at the time of the chargebacks that gave rise to them.  Attached to this Certification is a scheduling setting forth the date of each chargeback or multi-factoring fine, the amount of such fines, and the remaining balance of the funds on which Oceanic placed a "hold" pursuant to BanKard's instructions . . .  [A]fter the imposition of chargeback and multi-factoring fines, the balance of the

**STATEMENT**

funds on which the "hold" had been placed was reduced to $36,326.55.

After June 27, 2005, no further fines were imposed against the funds on which the "hold" had been placed pursuant to BanKard's instructions . . .

[A]ll funds were held in a commingled bank account and, consequently, specific withdrawals were not made from the commingled account for each fine transaction. Accordingly, the balance of the funds subject to the "hold" that was placed pursuant to BanKard's instructions is not reflected in the records relating to the commingled bank account, but rather reflects the balance of funds to which Cleverlink would be entitled to assert its contractual claims.

(*Id.*, Ex. D.) The schedule attached to Mr. Sholes' certification lists "Chargeback Fines" and "Multifactoring Fines" (for as much as $62,600), but Mr. Sholes did not submit any documentation substantiating these fines. (*Id.*, Ex. D.) Also, the origin of the schedule itself is unclear.

The FTC challenges Oceanic's characterization of events. Specifically, the FTC points to Oceanic's bank records from which it concludes that Oceanic possessed and then dissipated Cleverlink's assets after receiving notice of the TRO and preliminary injunction. (R. 48-1, FTC's Motion at 4-5, Ex. E.) In reaching its conclusion, the FTC alleges that: (1) Oceanic admits that, on April 20, 2005, it possessed $352,126.55 on behalf of Cleverlink; (2) Oceanic's bank records show that on April 20, 2005 Oceanic had $30,602 in its checking account and $418,935.66 in its savings account; (3) Oceanic's "records further show that . . . no additional money was deposited into Oceanic's savings account, except for a $25,000 transfer from Oceanic's checking account to its savings account on April 21, 2005;" and (4) Oceanic's bank records further show that, on June 30, 2005 (when Oceanic received notice of the preliminary injunction), Oceanic's savings account contained the account balance of $300,876.86. (*Id.* at 4 n.2, 5.) From these facts, the FTC concludes further that "Oceanic still possessed most, if not all, of the Cleverlink funds" that Oceanic possessed on April 20, 2005. (*Id.*) Since that time, Oceanic, so the FTC contends, has dissipated Cleverlink's assets to the tune of $175,000, leaving a balance of only $124,000. (*Id.* at 5.)

In response to the FTC's Motion, Oceanic submits another declaration by Mr. Sholes. In the main, Mr. Sholes reiterates what he said in his prior Certification. (R. 57-2, Sholes Decl. at ¶¶7-14.) In addition, Mr. Sholes makes averments regarding Oceanic's relationship with Illinois, the forum state, with an obvious eye toward demonstrating the Court's supposed lack of personal jurisdiction over Oceanic. Mr. Sholes avers that Oceanic – a "service provider to merchants who wish to accept credit cards in payment for goods or services" – is a limited liability company organized under the laws of New Jersey, with its principal place of business in Toms River, New Jersey. (*Id.* at ¶2.) Mr. Sholes further avers that: (1) Oceanic has never owned or leased property in Illinois, and has never maintained an office or personnel there; (2) Oceanic "has no customers located in Illinois, nor has it ever;" (3) Oceanic has never directed marketing materials to Illinois; (4) Oceanic's bank accounts are maintained, at Wachovia Bank in South Amboy, New Jersey; and (5) the contract pursuant to which Oceanic provided services to [ ] Cleverlink [ ], entitled "Merchant Payment Processing Services Agreement," provides in paragraph 18(e) that the contract "shall be governed by and construed in accordance with the laws of New Jersey. (*Id.* at ¶¶3-6.) Oceanic did not provide the Court with a copy of its contract with Cleverlink, or any other supporting documentation, save an "updated and amended accounting." Again, the origin of the updated accounting is unclear (although Mr. Sholes seems to suggest that he created it upon review of Cleverlink's business records).

# STATEMENT

## ANALYSIS

As noted above, the FTC seeks to freeze the remaining Cleverlink assets that Oceanic possesses, an accounting, and a rule to show cause as to why Oceanic should not be held in contempt of court. In response, Oceanic contends that the Court lacks jurisdiction over Oceanic (because it does not have minimum contacts with the forum), and that Oceanic has not violated the Court's TRO or preliminary injunction (because the assets it allegedly dissipated were not Cleverlink's).

## I.     Jurisdiction

Notwithstanding Mr. Sholes Declaration, the Court may in fact have personal jurisdiction over Oceanic. Mr. Sholes's Declaration does not speak to whether Oceanic – which Mr. Sholes describes as a service provider for merchants' credit card transactions (the website describes Oceanic as a "high risk merchant account processing specialist (R. 61-1, FTC's Reply in Supp. of the Motion, Ex. D)) – processed credit card transactions for Illinois residents on behalf of Cleverlink. (R. 57-2, Sholes Decl. at ¶2.) If Oceanic did so, then the Court could be able to exercise specific jurisdiction. *See Federal Trade Comm. v. Productive Marketing, Inc.*, 136 F. Supp. 2d 1096, 1102-03 (C.D. Cal. 1996) (finding that specific jurisdiction existed over non-party credit card processing company in part because the non-party "completed thousands of transactions involving California residents, from which [the non-party] derived considerable financial benefit"). In addition, if Oceanic processed credit card transactions involving Illinois residents on behalf of its other clients, then this Court possibly could exercise general jurisdiction over Oceanic. *See, e.g., Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002) ("So-called general jurisdiction is proper only when the defendant has 'continuous and systematic' contacts with the state in question; if such contacts exist, the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts... [S]pecific jurisdiction [is] a more limited assertion of state power, in which personal jurisdiction exists for controversies that arise out of or are related to the defendant's forum contacts.").

On the cursory record before the Court, the Court cannot determine whether jurisdiction over Oceanic exists. Accordingly, the Court orders Oceanic to aver whether it has processed credit card transactions for Illinois residents on behalf of Cleverlink and to aver the extent to which it has processed credit card transactions for Illinois residents in its general course of business (including both the specific volume of Illinois transactions as well the percentage of overall volume that Illinois transactions comprise). *See In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 303 (3d Cir. 2004) ("At this stage, where the appellants have voluntarily appeared in the court to challenge jurisdiction and jurisdictional discovery is pending, the District Court indisputably has jurisdiction to determine whether there is personal jurisdiction upon completion of jurisdictional discovery."); *In re Uranium Antitrust Litigation*, 480 F. Supp. 1138, 1151 (N.D. Ill. 1979) ("[a court] possess[es] jurisdiction to determine [its] jurisdiction over the parties. In the exercise of that jurisdiction, [a court] may compel discovery to aid our resolution of the personal jurisdiction issues"). In addition, the Court orders Oceanic to identify the parties to whom Oceanic allegedly disburse funds and assets in response to fines and fees. In directing Oceanic to do provide these supplemental submissions, the Court is not reaching the merits of any other possible basis for personal jurisdiction over Oceanic, such as Oceanic's website or the possibility that 15 U.S.C. § 53 requires only nationwide minimum contacts to satisfy due process here.

# STATEMENT

## II.       Legal Standard for Civil Contempt

The Court now turns to Oceanic's second argument in response – that it did not in fact violate the Court's injunction and that civil contempt is not warranted. On this issue, the FTC "must prove by clear and convincing evidence that the opposing party violated a court order." *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (internal citation and quotation omitted). "The district court must be able to point to a decree from the court which sets forth in specific detail an unequivocal command" which the party in contempt violated." *Id.* (internal quotation omitted). "The district court does not, however, ordinarily have to find that the violation was 'willful' and may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* (internal quotation omitted).

## III.      Scope of the Injunction

Here, the rub lies in whether Oceanic (at the time it received notice of the TRO and preliminary injunction) possessed funds on behalf of Cleverlink or whether those funds, originally earmarked for Cleverlink, in fact rightfully belonged to others. The injunction, that is, only enjoins Oceanic from dissipating assets in its possession that it is holding *on behalf of Cleverlink*. (R. 30-1, Stipulated Preliminary Injunction at 17.) After analyzing the parties' briefs and supporting exhibits, the Court understands the FTC's concerns and fully appreciates the strong inference raised by Oceanic's bank records. There simply is not enough evidence in the record for the Court to definitively determine whether Oceanic has in fact violated the Court's injunction.

Although Oceanic has submitted a sworn statement purporting to explain its behavior after receiving notice of the TRO, Oceanic has not presented *any* documentary evidence to support its assertion that other parties properly imposed fines on Cleverlink's assets. If Mastercard or Visa or any other company accessed a five-digit fine, as Oceanic contends, then certainly those companies would have submitted a written demand and some sort of explanatory statement. Equally troubling is that Oceanic has not provided a copy of its contract with Cleverlink, according to which Oceanic supposedly imposed thousands of dollars in fines on Cleverlink's assets. That Oceanic has not provided this information could speak volumes. Accordingly, the Court orders Oceanic to show cause why the Court should not hold Oceanic in contempt.

## CONCLUSION

For the reasons stated above, the Court grants the FTC's motion for a rule to show cause. The Court directs Oceanic to submit briefing and supporting evidence explaining why the Court should not find Oceanic in civil contempt. This briefing is due on or before January 27, 2006. As part of that briefing, the Court orders Oceanic to submit the jurisdictional proffer described above. After reviewing Oceanic's submission, the Court will order an evidentiary hearing, if necessary. The Court reserves ruling on the FTC's request for a full accounting until it determines whether it has personal jurisdiction over Oceanic.

In addition, until the Court resolves the status of the funds possessed by Oceanic in the identified bank accounts, the Court orders Oceanic not to dissipate the remaining funds in its possession that it may be holding on Cleverlink's behalf. *See Securities & Exchange Comm. v. Cherif*, 933 F.2d 403, 415 (7th Cir. 1991) (allowing injunction to remain in effect pending the district court's determination of whether a nominal party had any legitimate interest in funds it possessed but that allegedly related to the defendant's securities law violations); (*see also* R. 80-1, FTC Motion for Leave To File a Second Am. Compl. at 2 n.1 (stating that in response to the FTC's motion to preserve assets and for a rule to show cause, "Oceanic stipulated to preserve certain assets. . .").) To the extent, Oceanic fails to do so the Court will levy sanctions, if

**STATEMENT**

appropriate.