# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 2889 |
| | ) | |
| vs. | ) | Judge Virginia M. Kendall |
| | ) | |
| CLEVERLINK TRADING LTD., *et al.*, | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

On June 29, 2005, Judge St. Eve issued a Stipulated Preliminary Injunction Order that prohibited the transfer of any monies that third party, Oceanic Telecommunications Services, LLC ("Oceanic"), was holding for Cleverlink Trading Ltd. ("Cleverlink"). Oceanic was aware of the injunctive orders immediately after they were issued. Thereafter, the FTC sought an order holding Oceanic in contempt of court for alleged violations of the injunctions, contending that following service of the injunction on Oceanic, hundreds of thousands of dollars that Oceanic was holding for Cleverlink were spirited away.

In her order of June 19, 2006, Judge Kendall (to whom the case had been transferred) determined that she had both subject matter and personal jurisdiction over Oceanic and its primary officer, Colin Sholes. *FTC v. Cleverlink Trading LTD.*, 2006 WL 1735276, at *3-5 (N.D. Ill. 2006). The June 19th order sent the matter here "for further discovery and any hearing regarding whether Oceanic or Colin Sholes should be held in contempt of court for violating the preliminary injunction." *Id.* at *5.

# I.
## FACTUAL BACKGROUND

The FTC brought the underlying action pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 57b; Section 7(a) of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), 15 U.S.C. § 7701 *et seq.*; and the FTC's Adult Labeling Rule, 16 C.F.R. Part 316.4. The FTC alleged that the defendants, who operated sexually oriented websites, engaged in the practice of sending unsolicited email advertising their website that failed to indicate that the emails contained sexually explicit material, and that often mislead the recipient as to the nature of the email's content. The FTC sought injunctive and other equitable relief against the defendants, one of which was Cleverlink Trading Limited ("Cleverlink"). (*Second Am. Compl.* ¶¶ 1, 26-35).

On the same day it filed suit, May 16, 2005, the FTC moved *ex parte* for a Temporary Restraining Order, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue pursuant to Rule 65 of the Federal Rules of Civil Procedure. The district court granted the motion and ordered the defendants' assets frozen, and it extended the order to any third parties who held or controlled these assets. A hearing followed on May 25, 2005, at which the court modified the TRO and approved the stipulations of the parties to extend the modified version through June 29, 2005.

On June 16, 2005, representatives of Cleverlink provided the FTC with sworn financial statements revealing that Oceanic was in possession of approximately $370,000 of Cleverlink's funds. (*Order of June 11, 2006*, at 1). Oceanic was said to have acted as an intermediary for the transmission of consumer credit card charges on Cleverlink's websites during March of 2005.

According to the statements, Oceanic held some of those funds rather than transferring them to Cleverlink.

The FTC served Oceanic with the TRO and informed it of the asset freeze on June 28, 2005. *FTC v. Cleverlink Trading LTD.*, 2006 WL 1735276, at *1 (N.D. Ill. 2006). On June 29, 2005, the court entered a Stipulated Preliminary Injunction ("SPI"), a provision of which specifically pertained to Oceanic, directing it to "hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any account or asset of, or held on behalf of, any Defendant, including Cleverlink Trading Limited, unless authorized in writing by the Court or counsel for the FTC." (SPI at 17, VIII(D)). The FTC served Oceanic with the SPI on June 30, 2005. *Cleverlink*, 2006 WL 1735276, at *1. Shortly thereafter, however, the FTC complained that Oceanic and its primary officer, Colin Sholes, had disregarded this freeze order and urged the court to require Oceanic and Mr. Sholes to show cause why they should not be held in contempt of court. *Cleverlink*, 2006 WL 1735276, at *1.

## II.
## THE INITIAL SUBMISSIONS REGARDING THE CLAIMED VIOLATION BY OCEANIC OF THE STIPULATED PROTECTIVE ORDER

### A.
### The Parties' Initial Briefing And Judge St. Eve's January 11, 2006 Ruling

In support of its motion, the FTC provided the following evidence: (1) a copy of the June 27, 2005 letter it sent to Oceanic informing it of the TRO; (2) a copy the SPI and proof of service upon Oceanic; (3) an August 25, 2005 letter from Oceanic to the FTC indicating that as of April 20, 2005, it held $352,126.55 as a set off against various charges, fines and expenses that Cleverlink had or would incur, purportedly in the amount of $599,238.92; (4) a September 16, 2005 certification from

3

Colin Sholes indicating that "chargeback" and "multi-factoring" fines had been imposed against Cleverlink from April 24, 2005 – four days after the Cleverlink account was closed – to June 27, 2005, reducing the amount held to $36,326.55; (5) bank records from Oceanic's checking and deposit accounts demonstrating that after being served with the SPI on June 30, 2005, Oceanic had withdrawn over $175,000 from its savings account. (*FTC's Motion to Preserve Assets and for Rule to Show Cause*, Atts. 1-5).[1]

The FTC complained that Oceanic had not provided documentation to substantiate the purported fines, had not provided any evidence that the fines were communicated to Cleverlink, and had not even submitted a copy of the agreement it had with Cleverlink that would allow the imposition of such fines. The clear inference, the FTC argued, was that the fines had not been imposed before Oceanic had notice of the SPI, and that Oceanic had, in fact, dissipated the funds in violation of the order.

In support of Oceanic's claim that it had not violated the order, Mr. Sholes filed a declaration in which he claimed that as of April 20, 2005, the total funds Oceanic held that were in any way related to Cleverlink were $352,126.55. (*Opposition*, *Ex.* A, ¶7, *Declaration of Colin Sholes* ("*10/26/05 Decl.*")).[2] According to Mr. Sholes, the fines and charges that dissipated the account had been accrued by Cleverlink before Oceanic received notice of the TRO and SPI in and late June. (*Id.*, ¶ 13). Mr. Sholes provided what purported to be a *summary* of Oceanic's business records that

---

[1] The FTC also adverted to the sworn statements from Cleverlink that Oceanic held $370,000 of its money, but did not attach the statements to its motion. (*Id.* at ¶ 3). The FTC has not provided me with copies of these statements either.

[2] This calculation matched that in Oceanic's letter of August 25, 2005 to the FTC.

he said indicated that Cleverlink had incurred $364,022.28 in fines from April 7 to June 28, 2005.[3] By the time Oceanic had notice of the SPI, Mr. Sholes explained, the total amount of funds Oceanic held to which Cleverlink might be entitled was $16,606.98. (*Id*.).[4]

In its reply, the FTC again stressed the absence of corroborative documentation regarding the basis for and imposition of the fines. It provided the court with bank records indicating that, as of June 30, 2005 – the day Oceanic was served with the SPI – Oceanic's deposit account had a balance of $300,876.86. (*FTC's Reply Memorandum*, Att. D, *Declaration of Theresa Bresnahan* ("*Bresnahan Decl.*"), ¶ 5, WCB0055)). Between June 30 and September 30, 2005, there were 26 withdrawals totaling $245,426.55. (*Id.*).

On January 11, 2006, Judge St. Eve issued a lengthy minute order granting in part the FTC's motion to preserve assets and for a rule to show cause why Oceanic should not be held in contempt of court. The order pointed out that the FTC had to "prove by clear and convincing evidence that [Oceanic] had violated a court order." (*Id.* at, 5). Although she "fully appreciate[d] the strong inference raised by Oceanic's bank records," Judge St. Eve concluded that there was not enough evidence to be able to "definitively determine" whether Oceanic violated the injunction. The "rub," the court said, lay in whether Oceanic, "(at the time it received notice of the TRO and preliminary injunction) possessed funds on behalf of Cleverlink or whether those funds, originally earmarked for Cleverlink, in fact rightfully belonged to others." (*Order of Jan. 11*, at 5)(parenthesis in original).

Judge St. Eve was troubled by Oceanic's presentation – or more accurately, the lack thereof. For example, she questioned why Oceanic had not provided any documentary evidence to support

---

[3] In the August 25, 2005 letter to the FTC, the amount was $599,238.92.

[4] In Mr. Sholes' September 16, 2005 certification to the FTC, the amount was $36,326.55.

5

its position regarding the imposition of claimed fines that Oceanic insisted accounted for and justified the temporally suspicious withdrawals. Indeed, it had not even supplied a copy of its alleged contract with Cleverlink, even though Mr. Sholes had purported to quote from it, and the imposition of fines or back charges was a function of the claimed agreement. (*Order of Jan. 11*, at 5). Judge St. Eve was deeply troubled by the absence of "any other supporting documentation" beyond what purported to be an updated and amended accounting, whose origin was unclear, although Sholes seemed to suggest that he created it upon review of Cleverlink's business records. "That Oceanic has not provided this information *could* speak volumes," she concluded. (*Order of January 11*, at 3, 5) (Emphasis supplied).

Judge St. Eve's hesitation in actually drawing the adverse inference that is permissible when a party fails to produce uniquely available evidence, *Graves v. United States*, 150 U.S. 118, 121 (1893); *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997), stemmed no doubt from a concern that Oceanic's failure to have produced the evidence may have been the result of inadvertence. Thus Judge St. Eve concluded that Oceanic should be given a last opportunity to provide the information. If they did not, there was time enough to determine the evidentiary consequences.

### B.
### The Second Round Of Briefing

### 1.
### The Nature Of Oceanic's Business

In response to the January 11th order, Oceanic submitted a declaration from Colin Sholes which more or less explained the nature of Oceanic's business. According to Mr. Sholes, Oceanic is in the business of developing contractual relationships with merchants who want to accept credit-card payments from customers in exchange for goods and services. (*Declaration of Colin Sholes*

6

("*2/6/06 Decl.*"), ¶ 8); *see also Declaration of Colin Sholes* ("*10/26/05 Decl.*"), ¶ 2). As such, Oceanic acts as an intermediary between its client – such as Cleverlink – and the merchant banks that approve (or disapprove) the credit card transactions between Oceanic's clients and consumers. (*2/06/06 Decl.*, ¶ 5). The service that Oceanic really provides, however, is more of a layer of insulation between the merchant banks and businesses like Cleverlink. But it is not so much the nature of these businesses – adult-content websites – that concerns the merchant banks. Internet businesses like Cleverlink are considered "high risk" by merchant banks for approval of credit card transactions. So Oceanic shoulders some of that risk, making its clients' transactions somewhat more acceptable to merchant banks and their associated businesses. (*See FTC's Reply Memorandum*, Att. D, *Declaration of Theresa Bresnahan* ("*Bresnahan Decl.*"), ¶¶ 6-10, Ex. 2; *2/06/06 Decl.*, ¶¶ 11-13, 37).

An adult website proprietor like Cleverlink solicits customers via email with spam. Those interested in the adult content Cleverlink offers can then apply for membership at the websites by providing their credit card information, which is forwarded to a "gateway processor" for collection. (*2/06/06 Decl.* ¶ 5) The gateway processor is, essentially, a company that writes software designed to collect and process credit card information, and it forwards the credit card information to a merchant bank for initial approval. Upon approval, the merchant bank then deposits the corresponding funds in a merchant account, which is managed by a "master merchant account holder," which in this instance was MerCarSé. The master merchant account holder may issue sub-accounts, which then distribute the funds to the appropriate websites. In this hierarchy, Oceanic is a sub-account holder. (*Id.* ¶¶ 6-8).

Just as the credit card funds flow from merchant bank to master account holder to sub-

7

account holder to merchant website, charges and fees follow this course in reverse. (*Id.* ¶¶ 9, 11-12). Each party must reimburse the party above it in the hierarchy when charges or fees are assessed. (*Id.* ¶¶ 11-12). Therefore, when assessed a charge or fee by the master account holder, the sub-account holder's recourse is against the website; in other words, Oceanic can only look to Cleverlink for recovery. (*Id.* ¶¶ 11-12). These fees and charges include merchant discount fees, transaction fees, declined transaction fees, account fees, high risk transaction fees, excessive authorization fees, chargeback fines (as when a cardholder denies having authorized a charge), and charges for multi-factoring (which involves impermissible processing charges for multiple products under one merchant account). (*10/26/05 Decl.* ¶ 11).

### 2.
### The Agreement Between Cleverlink and Oceanic

Under the pressure of the January 11th order, Oceanic finally provided the contract it claimed authorized the hundreds of thousands of dollars in chargebacks. It also produced what it claimed are the documents that support its case.

Mr. Sholes accounted for the absence of a signed agreement by claiming that the agreement had been executed electronically. (*See* "*Merchant Payment Processing Services Agreement*," *2/06/06 Decl.*, ¶ 23; Ex B).[5] Oceanic then cleared Cleverlink to accept credit cards from its customers by taking advantage of Oceanic's relationship with merchant master account holder, MerCarSé, and merchant bank, CNP BanKard. (*Id.*). An original hard copy of the contract was

---

[5] Cleverlink applied online in March of 2005 to utilize Oceanic's services, and Oceanic sent Cleverlink an e-mail that contained a "link" to a web-based document containing each and every fee and/or fine term contained in the Agreement. (2/06/06 Decl., ¶ 23; Ex. A). In order to be able to submit its application to submit charges, Cleverlink personnel had to click an "Accept" box indicating acceptance of the terms of the Agreement. (Id.). Cleverlink did so.

mailed to Cleverlink. (*Id.*). Oceanic has also attached what Mr. Sholes describes as the computer code lines evidencing Cleverlink's agreement. (*Id.* ¶ 24; Ex. C).

Exhibit D of the parties' Agreement sets forth the schedule of fees that might be incurred by Cleverlink during the parties' relationship. (*2/06/06 Decl.*, Ex B, at 4(¶ 7)). For example, Cleverlink would be charged 70 cents per transaction, an additional 35 cents per each declined transaction, and \$25 per chargeback. (*2/06/06 Decl.*, Ex B, at 17).[6] Significantly, exhibit G to the Agreement provided that if Cleverlink's account were closed due to chargebacks exceeding 1.75% of all transactions, Cleverlink would be fined at a rate of "\$100 per chargeback . . . for all chargebacks assessed on the account, assessed after the time of account closure and will continue to be assessed for the twelve-month period following account closure. (*2/06/06 Decl.*, Ex B, at 28 (¶ 10)). Here, Cleverlink's account was closed as a result of Cleverlink's malfeasance as of April 20, 2005. (*Opposition of Non-Party Oceanic*, at 7; *10/26/05 Decl.*, ¶¶ 7-9; *2/06/06 Decl.* ¶ 30).

Exhibit F of the agreement provided that fines and fees that had already been incurred could be assessed after closure of the client's account:

---

[6] The fees were:

- Merchant Discount fee is eight percent (8%) of total approved gross transactions
- Transaction Fee is 70 cents (\$0.70) per transaction
- Decline Fee is 35 cents (\$0.35) per declined transaction
- Refund Fee is 25 cents (\$0.25) per refunded transaction
- Chargeback Fee is twenty-five (\$25) per chargeback
- Retrieval Fee is fifteen (\$15) per retrieval request
- Excessive Authorization Fee is thirty-five cents (\$0.35) per excessive auth transaction
- Monthly maintenance fee is \$150
- High Risk Fees are thirty-five cents (\$0.35) per high-risk transaction
- Batch Fee is \$1 per day transactions were processed

(*2/06/06 Decl.*, Ex B, at 17).

9

[a]ll funds due to [Cleverlink] at the time of account closure will be held pending assessment of fines and fees due to be paid to [Oceanic] by [Cleverlink] on the Account, for a period of up to 24 months. . . At the time of account closure due to excessive chargebacks, all [Cleverlink] funds on hand are forfeited and shall be considered the property of [Oceanic] until the assessment is completed pursuant to this provision and the net excess funds remitted to [Cleverlink]. . . . All VISA, Mastercard and/or other card association fines assessed against [Cleverlink's] account may be paid from [Cleverlink's] funds on hand at the time of account closure.

(*2/06/06 Decl.*, Ex B, at 28 (¶ 10)).

Mr. Sholes admitted, however, that he could not be certain that the online version of the agreement to which Cleverlink assented included a provision that indicated a client would be charged a fine of $10,000 for instances of "multi-factoring," or charging for unrelated products on non-approved websites. Multi-factoring fees account for $70,000 worth of deductions from the Cleverlink account. (*2/06/06 Decl.*, ¶¶ 33-35). Yet, these fees are unsupported by the record since there is no supporting documentary evidence that the fines or rates were part of Cleverlink and Oceanic's Agreement. But all of the other fee rates Oceanic claims were applicable are supported by the Agreement.

It is the FTC's position that it matters not what the written agreement says since it was unsigned by Cleverlink, and thus there can be no contract. That being the case, the FTC reasons, all the chargebacks were unauthorized and in violation of the injunction. The salient (but not the only) difficulty with the argument, apart from the FTC's failure to cite a single supporting case, lies in its core premise, which ignores the pervasive changes that technology has wrought in commercial transactions. Today, a document signed by both parties is no more an essential prerequisite to an enforceable contract than is a seal.

There is no dispute that Cleverlink applied for Oceanic's services over the internet and

10

accepted the terms of the Agreement by clicking the "Accept" box. The click-the-box method of

acceptance in internet transactions is ubiquitous. It exists in connection with software licenses and

every imaginable form of online commercial transaction. [7] So long as there was an offer, an

acceptance, and bargained-for consideration, there was a contract. The fact that the acceptance may

have come electronically in the form of a click in a box is analytically meaningless, as all the cases

have held. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2nd Cir. 2004) [8]

These cases are, in the final analysis, a specific application of the broader principle that it is

the substance of what parties do and not the form the transaction may take that is conclusive. *Cf.*

*Welch v. Mandeville*, 14 U.S. 233, 236 (1816)(Story, J.); *Electric Bond & Share Co. v. SEC*, 303

U.S. 419, 440 (1938); *Di Santo v. Pennsylvania*, 273 U.S. 34, 43 (1927)(Brandeis, J.).

Apart from the electronic acceptance of the Oceanic offer, fundamental contract principles

demonstrate the unacceptability of the government's contention that Oceanic loses because there is

no "signed" contract: when one accepts offered benefits with knowledge of the terms of the offer

the taking constitutes an acceptance of the terms which become binding on the offeree. *See*

*Register.com*, 356 F.3d at 403; *Boomer v. AT & T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002); *Ragan*

---

[7] Judges are not precluded from taking note of what the rest of the world knows. Rule 201, Federal Rules of Evidence. *Compare Cuisinarts, Inc. v. Robot-Coupe Internat'l Corp.*, 509 F.Supp.1036, 1043 (S.D.N.Y. 1981)("District judges are competent to understand the obvious.").

[8] *See also Treiber & Straub, Inc. v. United Parcel Service, Inc.*, 04-0069, 2005 WL 2108081, *7 (E.D.Wis. Aug. 31, 2005)("The undisputed facts establish that the plaintiff would not have been able to complete the shipping process and receive an air bill if it had not clicked on the Terms and Conditions and agreed to them."); *DeJohn v. The .TV Corp. Intern.*, 245 F.Supp.2d 913, 919 (N.D.Ill.,2003)("click-wrap" agreement valid and enforceable contract and "[t]he fact that the contract is electronic does not affect this conclusion"); *Koresko v. RealNetworks, Inc.*, 291 F.Supp.2d 1157, 1162-1163 (E.D.Cal.,2003)(clicking box on the screen marked, "I agree" on website evinced express agreement to terms); *i.Lan Systems, Inc. v. Netscout Service Level Corp.*, 183 F.Supp.2d 328, 338 (D.Mass. 2002)(clicking "I agree" box an appropriate way to form enforceable contract); *Stomp, Inc. v. NeatO, LLC*, 61 F.Supp.2d 1074, 1081 (C.D.Cal.,1999)(enforcing assent to terms by clicking "accept" button).

*v. AT & T Corp.*, 355 Ill.App.3d 1143, 1149-50, 824 N.E.2d 1183, 1188 (5th Dist. 2005). That is precisely what occurred here.

Finally, the government's argument cannot coexist with its initial contention that Oceanic was holding a large sum of money *pursuant to a contract it had with Cleverlink* – a contract that according to the FTC was evidenced by Cleverlink's availing itself of Oceanic's services. Since a private litigant cannot advance simultaneously inconsistent positions in the same case and claim that both are true, neither can the government. A contrary conclusion would not only be illogical but would contravene the principle that at least in many contexts the government has greater obligations than ordinary parties. *Compare Berger v. United States*, 295 U.S. 78, 88 (1935); *Olmstead v. United States*, 277 U.S. 438, 485 (1928)(Brandeis, J., dissenting).

3.

**The Sholes Declarations Regarding Oceanic's Claims Of Fines And Fees Imposed Against Cleverlink And The Cleverlink Records Offered In Support Of Those Claims**

a.

Mr. Sholes has offered three sworn, exceedingly precise accountings between June 11, 2005 and January 11, 2005 of the Cleverlink funds. The problem is they are all different, and no attempt is made to explain the disparities. The first calculation came in his declaration of July 7, 2005 in which he swore that there were "$0.00 no available funds" on June 28, 2005 when he obtained notice of the injunction. (*FTC's Reply Memorandum*, Att. E, Sholes' Declaration of July 7, 2005). The second calculation came in his Declaration of September 16, 2005. "[S]witch[ing] positions as nimbly as if dancing a quadrille," *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953), Mr. Sholes now claimed the amount of the Cleverlink funds left in the account as of June 27th was $36,326.55.

12

(*FTC's Motion to Preserve Assets and for Rule to Show Cause*, Att. D, Sholes' Declaration of September 16, 2005). The third version came in his declaration of October 26, 2005. Now the claim was that the available funds were $16,606.98. Quite apart from the inconsistencies in the Declarations – as significant as they are in determining Sholes' credibility[9] – they are hopelessly inconsistent with the only credible documentary evidence in the case.

According to Mr. Sholes, $517,168.80 was deposited in Oceanic's account on behalf of Cleverlink in three transactions dated March 31, April 8, and April 20, 2005. (*10/26/05 Decl.*, Ex.). Oceanic disbursed $136,539.54 to Cleverlink on April 7, 2005, leaving $380,629.26 in Cleverlink funds by April 20th. (*10/26/05 Decl.*, Ex.). In his October 2005 declaration, Mr. Sholes claimed that Oceanic had deducted $364,022.28 in fees and fines from Cleverlink's account beginning April 7th and up to the time Oceanic had notice of the TRO and SPI on June 28th. (*10/26/05 Decl.*, ¶¶ 12-13). By that accounting, $16,606.98 ought to have been left in the account on June 28, 2005. (*10/26/05 Decl.*, ¶ 13; Ex.).

However, bank records made it clear that, when served with the TRO and the SPI, Oceanic had just over $300,000 in its account, *Order of Jan. 11, 2006*, at 3; *Cleverlink Trading*, 2006 WL 1735276, at *2,[10] and that Oceanic deducted the vast majority of what are now claimed to be fees and fines from the account in the wake of the TRO and SPI. From July 22, 2005, through September 30,

---

[9] Vacillating versions of events are a persuasive datum in making credibility determinations. *See, e.g., Ryder Truck Rental v. NLRB*, 401 F.3d 815, 827 (7th Cir. 2005); *Bailey v. United States*, 1997 WL 759654 at *35 (Fed.Cl. 1997); *United States v. Nixon*, 881 F.2d 1305, 1309 (5th Cir. 1989).

[10] Cleverlink was Oceanic's first client. (*2/06/06 Decl.*, ¶ 20). Oceanic alleges that it "had one other customer located in St. Petersburg, Florida," but offers no evidence regarding the volume of business it might have done with this client, and certainly nothing to suggest any of the funds in the account were earmarked for St. Petersburg. As of February 2006, it had no clients. (*Id.*). As a result, it is rather clear that the funds in the account at issue are Cleverlink-related funds, and Oceanic has not disputed this.

13

2005, $245,000 was withdrawn or transferred from the account containing Cleverlink's funds. (*FTC's Reply Memorandum*, Att. D, Declaration of Theresa Bresnahan, ¶ 5(c), Ex .1 at WCB0057-58); *Cleverlink Trading*, 2006 WL 1735276, *2. Between July 25, 2005, and September 15, 2005, Mr. Sholes *personally* withdrew $85,000 in increments of $9,000 or $9,500. (*Id.* at WCB0060-68); *Cleverlink Trading*, 2006 WL 1735276, *2. These personal withdrawals were never explained beyond claiming that they represented fines. Why the money was personally withdrawn was never explained at all.

Propinquity between some event and conduct that is claimed to be illicit can have significant evidentiary consequences. *See, e.g., Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) ("a plaintiff may demonstrate improper motive with evidence that an adverse employment action 'took place on the heels of protected activity'"); *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 710 (7th Cir. 2004)(the jury was entitled to view this "last-minute and half-baked account as a post-hoc explanation 'designed to obscure' unlawful behavior."). In the instant case, the timing of the withdrawals, *vis-a-vis* its learning of the court's orders, could scarcely be more significant. "The mind of justice, not merely its eyes, would have to be blind to attribute such . . . occurrence[s] to mere fortuity." *Avery v. Georgia*, 345 U.S. 559, 564 (1953)(Frankfurter, J., concurring).

### b.

In response to Judge St. Eve's concerns over the absence of any documentation to support Oceanic's claimed imposition of fines and fees against Cleverlink, Oceanic provided what it contends is such evidence, although the FTC calls it "indecipherable." Review of these documents supports the FTC's characterization. Indeed, the purported "business records" are so jumbled that they appear to be contrived. They most certainly do not support Oceanic.

14

Mr. Sholes, in his fourth Declaration, explains that Oceanic received all of Cleverlink's associated credit card account monies electronically from MerCarSé. (2/06/06 Decl., ¶ 26). MerCarSé would provide Oceanic with daily totals which would "batch" all transactions handled on a particular day. (Id., Exs. D; E). Oceanic had provided a copy of what Mr. Sholes calls the corresponding spreadsheet it received from MerCarSé purportedly reporting the "batched" transactions on a daily basis, and itemizing the deductions for fees, fines, and chargeback expenses, for Cleverlink credit card transactions. (Id., Ex. E). The exhibit is six pages of dated entries beginning on March 14, 2005, and continuing on a daily basis to August 7, 2005. Although that is well after Cleverlink's account was closed and its relationship with both Oceanic and MerCarSé had ended, one could perhaps suppose that chargebacks could take several weeks to appear and resolve themselves. Neither Mr. Sholes nor Oceanic's counsel explain this process, however, so that is mere speculation. As the documents read, without meaningful guidance, they suggest that a great deal of activity occurred after the TRO and SPI were entered and served after June 28, 2005 – the date Oceanic had notice of the injunctions.

While Mr. Sholes claims that the exhibit reflects deductions for fees and fines, the entries do not support the conclusion. The document's categories are "total settled amount," "merchant/credit reversals," "total credit counts," "chargeback total," and "merchant percentage." A representative sampling of the entries looks like this:

15

| PSI CLEVERLINK TRADING LTD | | | | Credits | | CHARGEBACK | MERCHANT |
|---|---|---|---|---|---|---|---|
| OUTGOING TRANSACTION DATE | MID | AFFILITE MERCHANT | TOTAL SETTLED AMT | MERCHANT CREDIT / REVERSALS | TOTAL CREDIT COUNTS | TOTAL | PERCENTAGE |
| 3/14/2005 | PSI Cleverlink | MerCarSé | - | - | - | $0.00 | 5.50% |
| 3/15/2005 | PSI Cleverlink | MerCarSé | - | - | - | $0.00 | 5.50% |
| 3/16/2005 | PSI Cleverlink | MerCarSé | - | - | - | $0.00 | 5.50% |
| 3/17/2005 | PSI Cleverlink | MerCarSé | - | - | - | $0.00 | 5.50% |
| 3/18/2005 | PSI Cleverlink | MerCarSé | - | - | - | $0.00 | 5.50% |
| 3/19/2005 | PSI Cleverlink | MerCarSé | 145,805.44 | - | - | $0.00 | 5.50% |
| 3/20/2005 | PSI Cleverlink | MerCarSé | 27,222.68 | - | - | $0.00 | 5.50% |

(*Id.*, Ex. E). On the final page of the exhibit, the entries are summarized as follows:

| Summary Below | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mar-05 | | | 582,549.47 | 16,804.18 | 452.00 | 0.00 | |
| Apr-05 | | | 391,518.64 | 31,090.66 | 918.00 | 21,458.10 | |
| May-05 | | | 0.00 | 0.00 | 0.00 | 37,230.05 | |
| Jun-05 | | | 0.00 | 0.00 | 0.00 | 13,205.77 | 1.05 |
| | | | | | | | |
| Mar-05 | | | | 2.88% | 2.58% | 0.00% | |
| Apr-05 | | | | 7.94% | 7.11% | 5.48% | |
| May-05 | | | | #DIV/0! | #DIV/0! | #DIV/0! | |
| Jun-05 | | | | #DIV/0! | #DIV/0! | #DIV/0! | |

(*Id.*, Ex. E). There is no amplification of the meaning of these figures by Oceanic.

The entries in the "Chargeback Total" column would appear to be the monetary amounts of all chargebacks for a given week, not a fine or a fee, which, under the Agreement, would be in multiples of $25 or $100. If that is the case, how are the number of chargebacks, and hence the number of fines incurred, determined? This, too, is left unexplained – one of the many questions raised rather than answered by Oceanic's evidentiary presentation.

Mr. Sholes then points to Exhibit F, which he describes as a copy of the spreadsheet

MerCarSé provided Oceanic, listing MasterCard and Visa fees MerCarSé deducted from Cleverlink's account. None of the entries in this six-page exhibit are dated; nor do any of them refer to Cleverlink. A representative sample looks like this:

| Master Card Fines | | | | VISA Fines | | | |
|---|---|---|---|---|---|---|---|
| Chargeback - $25 | 1% Surcharge | 5% Addt'l Reserve | Retrieval - $5 | Chargeback - $25 | 1% Surcharge | 5% Addt'l Reserve |
| - | - | - | - | - | - | - |
| - | - | - | - | - | - | - |
| - | - | - | - | - | - | - |
| - | - | - | - | - | - | - |
| - | - | - | - | - | - | - |
| - | 612.38 | 3,061.91 | - | - | 845.67 | 4,228.36 |
| - | 114.34 | 571.68 | - | - | 157.89 | 789.46 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| - | 84.94 | 424.68 | - | - | 117.29 | 586.47 |
| - | 582.43 | 2,912.15 | - | - | 804.31 | 4,021.53 |
| - | 264.73 | 1,323.65 | - | - | 365.58 | 1,827.90 |
| - | 96.51 | 482.53 | - | - | 133.27 | 666.35 |
| - | 100.55 | 502.73 | - | - | 138.85 | 694.25 |

(*Id.*, Ex. F). The columns headed "1% Surcharge" are seemingly totaled at various points in the exhibit. The "Retrieval" and Chargeback" columns have entries every eleven or twelve lines beginning on the second page of the exhibit, but these entries are not multiples of the $5 and $25 fines indicated on the first page. In other words, the "Retrieval" column has entries like $1272.60 or $483.00 (*Id.*, Ex. F, at 2); neither figured could be arrived at by tallying $5 fines. Similarly, the "Chargeback" column has entries such as $1757.40 or $667.00 (*Id.*, Ex. F, at 2); again, neither amount could be derived by adding any number of $25 fines. So the exhibit does not refer to Cleverlink, does not include any dated entries, and its math is confusing and is, once again, unexplained.

17

These problems with Exhibit F aside, Mr. Sholes goes on to explain that once Oceanic received these spreadsheets from MerCarSé, it would deduct for its fees and fines and reserves, and provide weekly batch summaries to Cleverlink. (*2/06/06 Decl.*, ¶ 27). There is no explanation of how it would arrive at the number of chargebacks -- fined at rates of $25 or $100 each – from what are apparently the monetary totals of chargebacks, but that is not the most perplexing thing about this particular exhibit. Oceanic attaches a copy of the summary sheet it sent to Cleverlink for the week of March 14 - 20, 2005 as Exhibit G. Unlike the foregoing documents, this summary sheet is relatively self-explanatory:

| | | | Count | | Amount |
|---|---|---|---|---|---|
| **Total Volume** | | | **4,903** | **$** | **173,029.10** |
| **Less Refunds/Reversals** | | | 0 | $ | - |
| **Less Refund Fee** | $ | 0.25 | 0 | $ | - |
| **Less Chargebacks** | | | 0 | $ | - |
| **Less Reserve** | | 10.00% | | $ | 17,302.81 |
| **Less Discount Fee** | | 8.00% | | $ | 13,842.25 |
| **Less Transaction Fee** | $ | 0.70 | 4,903 | $ | 3,432.10 |
| **Less Retrieval Fee** | $ | 15.00 | 0 | $ | - |
| **Less Chargeback Fee** | $ | 25.00 | 0 | $ | - |
| **Less One Time Charges** | | | | $ | 1,881.60 |
| **Less Wire Fee** | | | | $ | 30.00 |
| **Less Carry Forward** | | | | $ | - |
| **Total Deductions** | | | | $ | 36,488.76 |
| **Plus Amounts Held (Refund for Duplicate Ck. Fee)** | | | | | |
| **Plus Reserve Release** | | | | $ | - |
| **Total Wire Amount** | | | | **$** | **136,539.34** |

(*Id.*, Ex. G). This, then, would seem to represent Oceanic's imposition of fines and fees against Cleverlink, and Oceanic's notification thereof to its client. The sales data – transactions and amount, is broken down by date on page 2 of the exhibit. Fees and fines – such as transaction fees chargeback fines – are also broken down by date. (*Id.*, Ex. G). But, most significantly, this exhibit pertains to just one week in March – a week in which no fines were levied.

18

According to Oceanic, it sent one of these summaries to Cleverlink each week fines were levied, which occurred purportedly through the end of April and beyond. Where, then, are the corresponding summaries? This exhibit, covering a single week in which *no* chargeback fines were incurred, is of no utility in establishing when and whether Oceanic imposed the massive amounts of fines and fees against Cleverlink that it claims it did before notification of the injunction. Oceanic's failure to have provided meaningful documentation after being instructed by Judge St. Eve to do so "[does now] speak volumes."

Next, Mr. Sholes adverts to Exhibit H, which he describes as a printout of all computerized transactions on Cleverlink accounts that Oceanic received from MerCarSé. (*2/06/06 Decl.*, ¶ 27). He explains that "[t]he computer automatically applies the rates identified in Exhibit A, which were agreed to in Exhibit B, to the transaction batch for MerCarSé, and calculates and totals the fees and fines as depicted and itemized in Exhibit H." (*Id.*). But Exhibit H, at twenty-five unnumbered pages (one page being blank), is all but indecipherable. Not a single entry among the scores of entries in the exhibit's first twelve pages is dated. So a representative sampling of those entries looks like this:

| DISCOUNT | SETTLED TRANSACTIONS | | | REFUND TRANSACTIONS | | |
|---|---|---|---|---|---|---|
| AMOUNT | TRANSACTION FEE | COUNT | AMOUNT | TRANSACTION FEE | COUNT | AMOUNT |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| 8,019.30 | 0.35 | 4098 | 1,434.30 | 0.25 | 0 | - |
| 1,497.25 | 0.35 | 805 | 281.75 | 0.25 | 0 | - |

\*     \*     \*

19

| | 0.35 | 0 | - | 0.25 | 0 | - |
|---|---|---|---|---|---|---|
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| - | 0.35 | 0 | - | 0.25 | 0 | - |
| | | | | | | |

\*　　　\*　　　\*

| DECLINE/EXCESSIVE | | | | REQUEST RETRIEVALS | | | CHARGEBAC | |
|---|---|---|---|---|---|---|---|---|
| TRANSACTION FEE | COUNT | AMOUNT | TOTAL | COUNT | RATE | AMOUNT | TOTAL COUNT | RATE |
| 0.35 | 0 | - | - | 0 | 15.00 | - | 0 | 25.00 |
| 0.35 | 0 | - | - | 0 | 15.00 | - | 0 | 25.00 |
| 0.35 | 0 | - | - | 0 | 15.00 | - | 0 | 25.00 |
| 0.35 | 0 | - | - | 0 | 15.00 | - | 0 | 25.00 |
| 0.35 | 0 | - | - | 0 | 15.00 | - | 0 | 25.00 |
| 0.35 | 4786 | 1,675.10 | 3,109.40 | 0 | 15.00 | - | 0 | 25.00 |
| 0.35 | 590 | 206.50 | 488.25 | 0 | 15.00 | - | 0 | 25.00 |

\*　　　\*　　　\*

| K | HIGH RISK FEES | | CHARGEBACK RESERVE | | ACCUMULATED CB RESERVE | | |
|---|---|---|---|---|---|---|---|
| AMOUNT | RATE | AMOUNT | RATE | AMOUNT | Month | Amount | CB RESERVE DEDUCTION |
| - | 0 | $0.00 | 10.00% | 0.00 | | | |
| - | 0 | $0.00 | 10.00% | 0.00 | | | |
| - | 0 | $0.00 | 10.00% | 0.00 | | | |
| - | 0 | $0.00 | 10.00% | 0.00 | | | |
| - | 0 | $0.00 | 10.00% | 0.00 | | | |
| - | 0 | $0.00 | 10.00% | 14580.54 | | | |
| - | 0 | $0.00 | 10.00% | 2722.27 | | | |

\*　　　\*　　　\*

(*Id.*, Ex. H). It is not until the thirteenth page that any dates appear: "March-05" and "April-05," repeatedly over the next several pages. And, as in Exhibit F, nowhere in the document is there any reference to Cleverlink. As submitted, the exhibit makes little sense; it certainly does not show that the deductions were authorized by and in accordance with the parties' agreement.

Nothing in Oceanic's submission can serve as a Rosetta Stone to assist in deciphering the exhibit. Only when the pages are laid out in a large, four-by-six mosaic so that they can be viewed as an integrated document, are they even remotely fathomable. Even then, however, the document raises infinitely more questions than it answers. First, the line entries are organized in blocks of seven, which would suggest weeks. (*See 2/06/06 Decl.*, ¶ 30). There are twenty-one such blocks, however, and as already noted, the only dates printed on the document are "March-05" and "April-05", which are reproduced in connection with nearly every block. Obviously, March and April are a far briefer span than twenty-one weeks. And, as has already been made clear, the account deductions at issue were made well after March and April. Where are the entries for those deductions, occurring in July-05 and August-05? There are none.

Second, under the heading "Settled Transactions," transaction fees are ticked off at 35 cents apiece, despite the provision in Exhibit D to the Agreement that allows a rate of 70 cents per transaction.[11] Third, in his second declaration, Mr. Sholes gives a slight hint regarding the reading of this exhibit: "Exhibit H, the column labeled 'decline/excessive' 'count number' shows the number of chargebacks. The numbers show a steep decline from the second week of business of 9,947 declines, to 7,281 with only 5,214 approved transactions." (*2/06/06 Decl.*, ¶ 30). But if these

---

[11] Mr. Sholes also indicated the rate was 35 cents per transaction in his initial declaration. (*10/26/05 Decl.*, ¶ 11).

constitute "chargebacks, it is unclear why the column indicating the "count" of chargebacks indicates "zero" for that period. There are no chargebacks indicated until the sixth "week" of the chart, but during that period, there are thousands of "decline/excessive" transactions. This would suggest the two items are not the same, contrary to Mr. Sholes' explanation.

Fourth, Exhibit H does not appear to support Oceanic's version of when chargebacks were accrued and fines imposed. Extrapolating from the only exhibit incorporating dates, Exhibit E, one can suppose Exhibit H's entries begin with March 19, 2005. If that is the case, the first chargeback entry is for April 24th – 609 of them, with accompanying fines levied at a rate of $25 each for a total of $15,150. By the time Oceanic admittedly became aware of the court order on June 28th (*10/26/05 Decl.*, ¶ 13), 2111 chargebacks had been tallied in Exhibit H. At the rate of $25 each indicated in Exhibit H, that would only amount to $52,775 – certainly not the $245,800 Oceanic contends it was entitled to levy. (*2/06/06 Decl.* ¶ 30). Even at the increased, punitive rate of $100 – referenced in Exhibit G to the parties' Agreement – the chargeback total would amount to $211,100, or more than $30,000 less than Oceanic submits is the proper amount.[12] But, nowhere in this document is there any indication that the $100 rate was ever imposed. In the end, however, as the exhibit is essentially undated, it does not prove what its proponent has offered it to prove.

Still worse for Oceanic, the chargeback amounts listed in this "spreadsheet" do not match the amounts Mr. Sholes claimed in his original declaration. The initial chargeback entry in Exhibit

---

[12] Under the Agreement, Oceanic was allowed to assess a fee of $100 per chargeback once chargebacks exceeded 1.75% of all transactions. (*2/06/06 Decl.*, Ex B, at 28 (¶ 10)). With a total of 32,762 transactions, Cleverlink would have reached the punitive level with its 573rd chargeback. So it would seem that the $100 fee would have been applicable at the time the first chargeback tally of 606 was entered in the spreadsheet. Nevertheless, according to Exhibit H, the rate was assessed as $25. This is just one more curiosity among the many spread throughout Oceanic's records.

H lists a total amount of $15,150 for what might be supposed was April 24th. Mr. Sholes, however, indicated the initial chargeback deduction amounted to $65,300 for the week ending May 1st. (*10/26/05 Decl.*, Ex.). There is no $65,300 entry for any date under the chargeback amount column on the spreadsheet and, again, even if one were to assume a $100 fine for chargebacks, the figures would still not match.

Indeed, here is a comparison of the actual chargeback entries from Exhibit H, by estimated dates, compared to hypothetical $100-rate-chargebacks, and the chargebacks claimed by Mr. Sholes in his initial declaration:

| Ex. H Estimated Date | Chargeback Count | Fee Deducted at $25 Rate | Possible $100 Fee | Mr. Sholes' Claims |
|---|---|---|---|---|
| 4/24/05 | 606 | $15,150 | $60,600 | 0 |
| 5/1/05 | 230 | $5,750 | $23,000 | $65,300 |
| 5/8/05 | 252 | $6,300 | $25,200 | $27,000 |
| 5/15/05 | 143 | $3,575 | $14,300 | $29,200 |
| 5/22/05 | 233 | $5,825 | $23,300 | $22,400 |
| 5/29/05 | 190 | $4,750 | $19,000 | $31,400 |
| 6/5/05 | 102 | $2,550 | $10,200 | $23,000 |
| 6/12/05 | 142 | $3,550 | $14,200 | $14,200 |
| 6/19/05 | 111 | $2775 | $10,500 | $18,200 |
| 6/26/05 | 102 | $2550 | $10,200 | $15,100 |
| | | | | |
| TOTALS | | $52,775 | $210,560 | $222,800 |

Not a single one of the fees deducted according to the Exhibit H spreadsheet match what Mr. Sholes claimed to have been deducted in his initial declaration. Even allowing for the assignment of the $100 penalty rate for all chargebacks – which is not sustainable – only a single entry matches, that of June 12th. Further undermining Oceanic's case is Mr. Sholes' Declaration of September 16, 2005, in which he claimed the following chargeback fines were imposed on these same dates: 4/24/05–$62,600; 5/1/05–$22,800; 5/8/05–$21,700; 5/15/05–$16,200; 5/22/05–$27,300;

5/29/05–$24,700; 6/05/05–$15,900; 6/12/05–$21,900; 6/19/05–$13,600; 6/26/05–$19,100. (*FTC's Motion to Preserve Assets and for Rule to Show Cause*, Att. D, Sholes' Declaration of September 16, 2005). Although the total of $245,800 matches the total in Mr. Sholes' October 2005 declaration, none of the individual entries match either Mr. Sholes' October 2005 declaration or the Exhibit H spreadsheet.

Overall, the math just does not add up for Oceanic – not as of January 11th, and not now. Out of an abundance of caution, Judge St. Eve chose not to draw inferences against Oceanic that she could have drawn last June. The present record is an ample basis on which to conclude that there has been a violation of the orders of which Sholes and Oceanic were aware. It demonstrates the illegitimacy of the massive post-June 30, 2005 transfers. While there is now evidence of an agreement between Cleverlink and Oceanic that allowed for the imposition of fines, there is not sufficient evidence from which it may be concluded that the withdrawals by Oceanic were pursuant to the agreement. The evidence points compellingly in the opposite direction.

The documentation Oceanic has offered on these critical questions ultimately is uninformative and indecipherable. Beyond this, however, the only document notifying Cleverlink of the imposition of fines and fees, relates to the week of March 14 - 20, 2005. There is no other such notice of a levying of fines for any point during the period at issue, despite the fact that in his most recent declaration, Mr. Sholes claimed that Cleverlink sent weekly notifications to Oceanic.

The other records are, in the main, undated, and thus prove nothing as to when fees and fines were imposed.[13] Oceanic's bank records demonstrate that a staggering amount of money was taken

---

[13] These undated figures are not even admissible to prove the timing of the imposition of the claimed fees and fines. *See United States v. Mahar,* 801 F.2d 1477, 1493 (6th Cir. 1986)(twelve pages of undated,
(continued...)

24

after Oceanic had notice of the TRO and SPI. Beyond that, to the extent the dates for the entries can

be divined, the amounts of the fees and fines from one document fail to match the fees and fines

from another. One document offered by Oceanic contradicts the next, which in turn contradicts each

of Mr. Sholes' declarations. It is precisely this sort of vacillation and inconsistency that requires

rejection of Oceanic's claims that they acted properly and that the massive withdrawals were justified

by and in accordance with the terms of the Cleverlink - Oceanic agreement.

Oceanic's contrived presentation borders on spoliation. The doctrine of spoliation is one of

the most enduring principles of common law. In essence, it provides that when a litigant, has

destroyed, fabricated, or suppressed evidence, the trier of fact may draw an inference that the

spoliator believes his case is weak or unfounded. The principle has best been described by Dean

Wigmore:

> It has always been understood--the inference, indeed, is one of the simplest in human
> experience--that a party's *falsehood or other fraud in the preparation and
> presentation of his cause*, his fabrication or suppression of evidence by bribery or
> spoliation, *and all similar conduct* is receivable against him as an indication of his
> consciousness that this case is a weak or unfounded one; and from that consciousness
> may be inferred the fact itself of the cause's lack of truth and merit. The inference
> thus does not necessarily apply to any specific fact in the cause, but operates,
> indefinitely though strongly, against the whole mass of alleged facts constituting his
> cause. 2 Wigmore, Evidence §278 at 133 (3d Ed. 1940)(emphasis supplied). *See also*,
> *id.* at §285 at 192 and §286 at 166; Maguire & Vincent, *Admissions Implied From
> Spoliation or Related Conduct*, 45 Yale L.J. 226 (1935).

Making judgments about a witness's credibility is often a tricky business. Demeanor can be

---

[13](...continued)

unsigned, handwritten notes did not qualify as "business records"); *Redken Laboratories, Inc. v. Levin*, 843
F.2d 226, 229 (6th Cir. 1988)(sales records inadmissible as they were undated and did not indicate the
customer to whom the goods were alleged to have been sold); *United States v. Skeddle*, 981 F.Supp. 1069,
1074 (N.D.Ohio 1997)(when proffered business records are undated, the proponent bears the burden of
demonstrating that such documents were prepared contemporaneously with the event they recite).

a component of the calculus. Indeed, the demeanor of a witness may satisfy the trier of fact not only that the witness' testimony is not true, but that the truth is the opposite of his story. See *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962); *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). *Cf. Wainwright v. Witt*, 469 U.S. 412, 428 (1985)(demeanor of juror).

In the instant case, Mr. Sholes has had ample opportunities to present his side of the case and to meet the force of the government's evidence. He has done so through sworn documents, and thus demeanor is not a factor to be considered here. But demeanor is not an indispensable component of credibility determinations, and its absence does not preclude a determination about the credibility of Oceanic's presentation. Indeed, if Judge Posner is right, demeanor is overrated, and judges fool themselves if they think they can make meaningful credibility determinations upon what ultimately are nothing more than intuitive guesses based perhaps more on a judge's background than some innate ability to divine the truth from a witness's body language and inflections. *See United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998). *Consolidation Services, Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 820 (7th Cir.1999); *United States v. Wells*, 154 F.3d 412, 414 (7th Cir.1998).

Apart from Judge Posner's *dubitante* opinions, the Seventh Circuit has stressed that credibility involves much more than demeanor, *Indiana Metal Products v. NLRB*, 442 F.2d 46 (7th Cir.1971), and that documents or objective evidence may contradict the witness' story, or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. *See Pinpoint, Inc. v. Amazon.Com, Inc.*, 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.) (sitting by designation). Indeed, where such factors are present, a court of appeals can find clear error in a finding of credibility based on demeanor, even though such determinations are, as a matter of practice, usually insulated from appellate review. *Ginsu Products, Inc. v. Dart*

26

*Industries, Inc.*, 786 F.2d 260, 263 (7th Cir.1986). [14]

In the instant case, the inconsistency and vacillation in the various stories told by Mr. Sholes

in his contradictory declarations, the contrived nature of the documentary evidence that Oceanic has

presented, and their failure to present meaningful and intelligible evidence – even though such

evidence, if it existed, should have been easily producible – combine to compel the conclusion that

the evidence is clear and convincing that Oceanic impermissibly transferred funds to itself and Mr.

Sholes, knowing that such transfers were prohibited by the injunction. *See* note 9, *supra*; *United*

*States v. Verrusio*, 742 F.2d 1077, 1081 (7th Cir. 1984)(where agents' versions of events

irreconcilably inconsistent district court did not err in discounting their testimony); *United States v.*

*Covelli*, 738 F.2d 847, 861 (7th Cir. 1984)("These inconsistent versions of the source of the goods

are evidence that Murray was aware of the stolen nature of the merchandise.").

## CIVIL CONTEMPT POWER

### a.

Prior to the Federal Courts Improvement Act of 2000 magistrate judges had no authority to

punish for contempt even if the contumacious act occurred in their presence or the parties had

consented to the magistrate judge's jurisdiction. Consistent with the expending role of magistrate

judges, *see* J. Cole, Magistrate Judge Practice at §[10.1], in Federal Civil Practice, (Illinois Institute

for Continuing Legal Education 2006), the Act gave them authority to act in matters involving

contempt. Now, magistrate judges in consent cases, under 28 U.S.C. § 636(c), may exercise the civil

---

[14]"'Testimony is not a discrete, self-contained unit of evidence examined and weighed without context; it is a part of the body of evidence which is intertwined and considered in its totality.'"*Ayi v. Gonzales*, 460 F.3d 876, 881 (7th Cir. 2006).

contempt authority of a district judge. *See* 28 U.S.C. §636(e)(4). In non-consent, civil cases, proceeding by referral under subsection (a) or (b), where a magistrate judge believes that an act constitutes a civil contempt, the magistrate judge shall:

> forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

28 U.S.C.A. § 636(e)(6)(B)(iii). [15]

By its terms, §636(e)(6) envisions those situations in which the claimed contempt occurs in the context of an extant referral (on a non-contempt matter) pursuant to which the magistrate judge is already proceeding. Hence, the Act's requirement of forthwith certification of facts to the district court and the authorization to order the putative contemnor to appear before the district court to show cause why he should not be held on contempt.[16] However, §636(e)(6) does not govern when the referral from the district court is to conduct proceedings in connection with a contempt matter pending before the district court. In that context, the magistrate judge's authority is defined by 28 U.S.C. §§636(b)(1)(B), not 28 U.S.C. §636(e).

**b.**

---

[15] *See generally, JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc.,* No. 03-5562, 2006 WL 1148110, *1 (S.D.N.Y. Apr. 28, 2006); *Bear Stearns Companies, Inc. v. Lavalle,* No. 03-1900, 2002 WL 485697, *1 n.1 (N.D.Tex. Mar. 29, 2002); 3A Wright, King & Klein, Federal Practice and Procedure: Criminal 3d § 716 (2004).

[16] Here, the district court had already issued a rule to show cause.

28

Parties, lawyers and others subject to court orders are obligated to abide by them, even if erroneous, until the orders are judicially modified or rescinded. *See Pasadena City Board of Education v. Spangler*, 427U.S. 424, 439 (1976); *Matter of Krynicki*, 983 F.2d 74 (7th Cir. 1992)(Easterbrook, J.); *McCann v. New York Stock Exchange*, 80 F.2d 211, 214 (2d Cir. 1935).

Findings of contempt are either "criminal" or "civil." The distinction lies not in the character of the action which is contumacious, but in the character of the penalty assessed. *See McDonald's Systems, Inc. v. Mason*, 552 F.Supp. 707, 709 (N.D.Ill.1982). Any act of contempt contains behavior which offends the rights of other parties (civil contempt) as well as behavior which offends the authority of the Court (criminal contempt). *Shakman v. Democratic Org. of Cook County*, 533 F.2d 344, 348 (7th Cir.), *cert. denied*, 429 U.S. 858 (1976) (*citing Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418 (1911)). Therefore, the focus shifts to the penalty as a means of characterizing the contempt. If the thrust of the penalty assessed is primarily to recompense the other party and/or to coerce compliance, it is civil contempt; if the penalty seeks primarily to vindicate the power and authority of the Court, then it is criminal contempt. *Shakman*, 533 F.2d at 349; *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 784 (7th Cir.1981).[17]

A court's civil contempt power rests in its inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner. To be held in civil contempt, a person must have violated an order or decree that sets forth in specific detail an unequivocal command. *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir.2001). Civil contempt proceedings are designed to be coercive and remedial, not punitive. *Jones v. Lincoln Elec. Co.*, 188

---

[17] There are also certain procedural characteristics which distinguish the two types of contempt, including the enhanced burden of proof beyond a reasonable doubt in criminal contempt and the right to notice of charges, assistance of counsel, summary process, the right to present a defense and the right to a jury trial if the contempt involves imprisonment beyond six months. *See In re Troutt*,460 F.3d 887 (7th Cir. 2005).

F.3d 709, 738 (7th Cir.1999). The party asserting a violation of a judicial order has the burden of proving the violation by clear and convincing evidence--which is, of course, a substantially greater burden of proof than preponderance of the evidence. *Dowell*, 257 F.3d at 699; *Hernandez v. O'Malley*, 98 F.3d 293, 295 (7th Cir.1996).

The function of any standard of proof is to indicate the degree of confidence society thinks a factfinder should have in the correctness of factual conclusions for a particular type of adjudication. By informing the factfinder in this manner, the standard of proof allocates the risk of erroneous judgment between the litigants and indicates the relative importance society attaches to the ultimate decision. *Colorado v. New Mexico*, 467 U.S. 310, 315-16 (1984). The requirement in cases of contempt that the evidence be clear and convincing manifests society's judgment that the risk of error is to be borne by the party seeking the contempt order and its unwillingness to allow punishment for a claimed violation of a court order, save where the evidence warrants a high degree of confidence in the correctness of the determination that a contempt has occurred.

The Supreme Court has defined clear and convincing evidence in this context as placing "in the ultimate factfinder an abiding conviction that the truth of [the movant's] factual contentions are 'highly probable.' " *Colorado*, 467 U.S. at 316. *See also United States v. Boos*, 329 F.3d 907, 911 (7th Cir.2003). The standard is met "only if the material ... offered instantly tilted the evidentiary scales in the affirmative when weighed against the evidence ... offered in opposition." *Colorado*, 467 U.S. at 316. It is not necessary to a finding of contempt that a violation was "willful." It is enough that a party "has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir.1995). *See also McDonald's Syst., Inc.*, 552 F.Supp. at 710.

It is my recommendation that when the record is viewed in its totality, the evidence is clear and convincing that Oceanic has violated the court's orders. The FTC's motion ought to be granted,

and Oceanic should be held in civil contempt. A district court has broad discretion in fashioning a remedy in cases such as this. *Spallone v. United States,* 493 U.S. 265, 276 (1990). Requiring Oceanic to return all the monies taken after it had notice of the court's orders is an appropriate component of any order ultimately entered by the court. The court also has discretion to require payment of reasonable attorneys' fees or a fine. *Wzorek v. City of Chicago,* 906 F.2d 1180, 1185 (7th Cir. 1990); *Rousseau v. 3 Eagles Aviation, Inc.,* 130 Fed.Appx. 687 (5th Cir. 2005); *Maynard v. Nygren,* 332 F.3d 462, 470 (7th Cir. 2003).

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/26/06

Any objections to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation. *See* Fed.R.Civ.P. 72(b); 28 U.S.C. 636(b)(1)(C); *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 329 (7th Cir. 1995).