UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.  05 C 2889 |
| | ) | |
| CLEVERLINK TRADING LIMITED, *et al.* | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendants, | ) | |
| | ) | |
| OCEANIC TELECOMMUNICATIONS | ) | |
| SERVICES, LLC and COLIN H. SHOLES, | ) | |
| | ) | |
| Relief Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Federal Trade Commission ("FTC") brought this action against Cleverlink Trading Limited ("Cleverlink"), Real World Media, LLC, Crazy Protocol Communications, Inc., Brian D. Muir, Jesse Goldberg and Caleb Wolf Wickman ("Defendants").  Defendants sold memberships to Web sites that provided adult entertainment.  The FTC sought injunctive and other equitable relief for Defendants' alleged violations of the Controlling The Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), 15 U.S.C. § 7701, *et seq.*, and the FTC's Adult Labeling Rule, 16 C.F.R. Part 316.4.  On May 16, 2005, this Court entered a temporary restraining order enjoining Cleverlink and the other Defendants from engaging in further violations of CAN-SPAM and freezing Defendants' assets, including assets held by third parties.  On June 16, 2005, Cleverlink representatives provided the FTC with sworn financial statements indicating that Oceanic Telecommunications Services, LLC ("Oceanic") possessed approximately $370,000 of Cleverlink's funds.  On June 29, 2005, this Court entered a Stipulated Preliminary Injunction between Defendants and the FTC.  Paragraph VIII(D) of the Stipulated Preliminary Injunction directed that upon being

served with the order, Oceanic "shall hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale or other disposal of any account or asset of, or held on the behalf of, any Defendant, including Cleverlink Trading Limited, unless authorized in writing by the Court or counsel for the FTC." The FTC served Oceanic with a copy of the Stipulated Preliminary Injunction on June 30, 2005. On October 3, 2005, the FTC filed a motion to preserve assets and for a rule to show cause as to why Oceanic should not be held in contempt of court. In that motion, the FTC alleged that Oceanic and its sole owner, Colin Sholes ("Sholes"), had dissipated funds held on behalf of Cleverlink in violation of the Court's order. The matter was referred to Magistrate Judge Cole who issued a Report and Recommendation that Oceanic should be held in civil contempt.

On January 12, 2006, the FTC filed a Second Amended Complaint naming Oceanic and Sholes as Relief Defendants in Count VI. Count VI alleges that Relief Defendants received assets which were the proceeds of Cleverlink's unlawful activities and to which Relief Defendants have no legitimate claim. On July 12, 2006, the FTC and Defendants entered into a Stipulated Order for Permanent Injunction and Final Judgment. In the Stipulated Order, Defendants admitted no liability, agreed to pay a fine and were permanently enjoined from violating the CAN-SPAM Act and the Adult Labeling Rule. The only claim remaining in this action involves the funds allegedly held by Oceanic on behalf of Cleverlink. The FTC seeks disgorgement of Cleverlink's funds from Relief Defendants and asks this Court to hold Oceanic and Sholes in civil contempt for dissipating those assets in violation of the Court's order. Now before the Court are: (i) the FTC's Motion for Summary Judgment Against Relief Defendants; (ii) Oceanic's and Colin H. Sholes' Motion for Summary Judgment as to Count VI; (iii) Oceanic's and Colin H. Sholes' Motion for Summary

Judgment as to its Compliance with the June 29, 2005 Stipulated Preliminary Injunction and (iv) the parties' objections to the Magistrate Judge's Report and Recommendation regarding the FTC's Motion To Preserve Assets and For Rule To Show Cause As To Why Oceanic Should Not Be Held In Contempt Of Court.

Relief Defendants base their claim to the disputed funds on a Merchant Payment Process Services Agreement ("MPPSA") allegedly made between Oceanic and Cleverlink and a state court default judgment Oceanic obtained against Cleverlink. First, Relief Defendants offer no competent evidence that Cleverlink agreed to the version of the MPPSA submitted to this Court. Absent such proof, Relief Defendants may not rely on the increased fines and the forfeiture provision in Exhibit G, ¶ 10, of that document. Relief Defendants have no legitimate claim to the funds generated through Cleverlink's credit card sales beyond the fines and fees to which Cleverlink's representatives agreed in their telephone conversation with Sholes and reflected in the summaries Sholes prepared. Second, the state court default judgment does not preclude this Court from exercising its equitable power to order disgorgement. The limited scope of the *Rooker-Feldman* doctrine does not apply to this case because the state court proceedings were commenced after this action and the FTC was not a party to the state court action. This Court orders Relief Defendants to disgorge the $292,829.26 that were the profits of Cleverlink's unlawful activities and to which Relief Defendants have no legitimate claim.

As Cleverlink's agent, Oceanic held more than $300,000 on behalf of Cleverlink at the time it and Sholes were served with the Stipulated Preliminary Injunction. Sholes' statements that Oceanic imposed fines and fees against Cleverlink's funds prior to receiving the Stipulated Preliminary Injunction are neither support by the documents nor otherwise credible. This Court

holds Oceanic and Sholes in civil contempt for willfully withdrawing and transferring those funds in violation of this Court's unambiguous and unequivocal order. This Court sanctions Oceanic and Sholes the amount of the disputed funds to which they had a legitimate claim – $51,800.

## Statement of Facts

Colin Sholes formed Oceanic on March 7, 2005 to provide services to clients who wished to process credit card transactions over the Internet. (FTC's Rule 56.1(a)(3) Statement ("FTC") ¶ 2; Oceanic Telecommunications Services, LLC's and Colin H. Sholes' Rule 56.1(a) Statement ("Relief") ¶ 18.) Sholes is the sole owner of Oceanic. (FTC ¶ 3; Relief ¶ 9.) Oceanic entered into an agreement with Mercarse, a company that manages small merchant accounts, for the purpose of facilitating the processing of credit card charges of Oceanic's customers. (FTC ¶¶ 12, 15.) Mercarse had a relationship with a credit card processor located in the Phillippines called CNP which processed credit card transactions for a bank in the Phillippines called Bankard. (FTC ¶¶ 12, 14; Relief ¶ 21-22.) Oceanic agreed to present applications from potential clients for Mercarse's review so that, upon approval, those clients would be able to process credit cards through the conduit of Oceanic and Mercarse. (FTC ¶ 16.)

Cleverlink is a company whose primary business was the sale of memberships to Web sites that offered adult entertainment. (FTC ¶¶ 18-19.) From at least January 2005, Cleverlink accepted credit cards as a method of payment for its Web site memberships. (FTC ¶¶ 21-22, 24.) In early March 2005, after losing its prior means of credit card processing, Cleverlink sought credit card processing services from Oceanic. (FTC ¶ 22; Relief ¶¶ 23-24.) Sholes, using the name "Rich," communicated to a Cleverlink representative, Caleb Wickman, that Oceanic could facilitate processing Cleverlink's credit card transactions. (FTC ¶¶ 23, 33; Relief ¶ 25.) "Rich" and Wickman

discussed the terms of their agreement including Oceanic's charges, fines and fees for its services. (FTC ¶¶ 33, 34.) Based on this telephone conversation, Wickman states that he understood Oceanic would deduct 8% of the Cleverlink credit card transactions as a fee, $25 per chargeback[1] and certain other transaction and maintenance fees. (FTC ¶ 34.) Sholes swears that, in addition to this telephone conversation, the parties memorialized their business relationship in the MPPSA. (Relief ¶ 26; FTC Ex. 4 at ¶ 23.) Relief Defendants do not have a signed copy of the MPPSA. (Relief Ex. 10.) Sholes explains that he sent Cleverlink an e-mail containing a link to the web-based document. (FTC Ex. 4 at ¶ 23. ) In order to submit its application, Sholes contends that Cleverlink would have had to click an "Accept" box and then digitally sign the document. (*Id.*) Sholes declares that Cleverlink accepted and electronically signed the MPPSA, including the exhibits which contained the fees and fines schedules, via this process. (*Id.*) Sholes says that he then mailed a hard copy of the contract to Cleverlink. (*Id.*) In January of 2006, Sholes sent an email to his attorney containing lines of computer code. (FTC's Objections to R&R, Ex. 7.) Sholes stated in the email that the lines of code show that an email was sent to Cleverlink on March 11, 2005 with information on the processing agreement. (*Id.*)

The MPPSA includes many terms consistent with those stated by Wickman and contained on Oceanic's website. (*Compare* Relief Ex. 10 *with* FTC Ex. 6 at ¶ 3 and FTC Ex. 3, Att. C.) Exhibit D of the MPPSA sets forth the following schedule of fees: Merchant Discount fee is eight percent (8%) of total approved gross transactions; Transaction Fee is 70 cents ($0.70) per transaction; Decline Fee is 35 cents ($0.35) per declined transaction; Refund Fee is 25 cents ($0.25)

---

[1] A chargeback occurs when a consumer requests a refund from his credit card company or seeks to cancel a transaction.

per refunded transaction; Chargeback Fee is twenty-five ($25) per chargeback; Retrieval Fee is fifteen ($15) per retrieval request; Excessive Authorization Fee is thirty-five cents ($0.35) per excessive auth transaction; Monthly maintenance fee is $150; High Risk Fees are thirty-five cents ($0.35) per high-risk transaction; and Batch Fee is $1 per day transactions were processed. While these basic fees are comparable, Exhibit G entitled "Additional Terms, Provisions and Conditions" lists certain other terms. Of particular importance is the provision that "[a]t the time of account closure due to excessive chargebacks, all [Cleverlink] funds on hand are forfeited and shall be considered the property of [Oceanic] until the assessment is completed pursuant to this provision and the net excess funds remitted to [Cleverlink]." (Relief Ex. 10 at Exhibit G, ¶ 10 (e).) Additionally, if Cleverlink's account were closed due to chargebacks exceeding 1.75% of all transactions, Cleverlink would be fined at a rate of "$100 per chargeback . . . for all chargebacks assessed on the account, assessed after the time of account closure and will continue to be assessed for the twelve-month period following account closure." (Relief Ex. 10 at Exhibit G, ¶ 10(a), (b).) Wickman declares that he was never made aware of the terms in Exhibit G, ¶ 10, during his telephone conversation with "Rich," and that no one at Cleverlink ever saw a copy of the MPPSA. (FTC Ex. 6, ¶ 3.) An August 5, 2005 letter from an attorney for Relief Defendants to the FTC states that "[t]he business relationship between Oceanic and Cleverlink was never reduced to a signed, written agreement." (FTC Ex. 9, Att. A.)

Mercarse approved Cleverlink to process credit card transactions, and Cleverlink's credit card transactions began being processed through Oceanic and Mercarse on March 19, 2005. (FTC ¶¶ 25-26.) If a consumer made a credit card purchase on a Cleverlink Web site, the transaction passed through various parties until it reached the MasterCard and Visa network. (FTC ¶ 27.) If

the transaction was approved, funds were remitted to Bankard, who remitted the funds to CNP, who remitted the funds to Mercarse, who remitted the funds to Oceanic, who remitted the funds to Cleverlink. (FTC ¶ 28.)

In the month that Oceanic assisted Cleverlink to process credit cards, Cleverlink's credit card transactions generated $974,068.11. (FTC ¶¶ 53-54.) Pursuant to an agreement between Oceanic and Mercarse, fees were deducted from these Cleverlink funds, including $25 per chargeback. (FTC ¶ 55.) Over $100,000 in fines were deducted from the Cleverlink funds for excess chargebacks and Bankard and CNP held ten percent of the Cleverlink proceeds as a reserve against future chargebacks. (FTC ¶¶ 56-57.) Mercarse identified the money deducted from the Cleverlink account in spreadsheets that it submitted weekly to Oceanic. (FTC ¶ 60.) These spreadsheets were produced from the records of Capstone Payment Systems, a company that provided transaction archiving for Mercarse. (FTC ¶ 61.) According to Sholes, Oceanic then used the Mercarse spreadsheets to prepare account summaries showing the amount that Oceanic owed Cleverlink for each payment period. (FTC ¶¶ 62, 66.) Oceanic received three payments from Mercarse based on credit card sales generated by Cleverlink. (FTC ¶ 63.) The three payments totaled $517,168.80. (*Id.*) Oceanic received the first payment in the amount of $142,581.09 on March 31, 2005. (*Id.*) After deducting its fees, as set forth in an account summary prepared by Sholes, Oceanic paid $136,539.54 to Cleverlink on April 7, 2005. (FTC ¶¶ 64-65.) Oceanic received the second payment in the amount of $260,231.65 on April 8, 2005 and the third payment in the amount of $114,356,06 on April 20, 2005. (*Id.*) Cleverlink's credit card transactions ceased being processed on April 20, 2005 due to excess chargebacks. (FTC ¶ 31.) Pursuant to Sholes' account statements, after deducting its fees, Oceanic owed: (1) $248,764.79 to Cleverlink from the second payment and (2) $95,876.19 from the

third payment. (FTC ¶ 66.) Oceanic never paid this $344,629.26 to Cleverlink. (FTC ¶ 67.)

Sholes transferred the funds from Mercarse into Oceanic's savings account, commingling them with Oceanic's other funds. (FTC ¶ 70.) On June 30, 2005, Oceanic's savings account held $300,876.86. (FTC Ex. 14, ¶ 2(a).) Between June 13, 2005 and October 5, 2005, Sholes personally withdrew $154,500 from the Oceanic bank account. (FTC ¶ 71.) Sholes used this money to pay himself a salary and pay his personal bills. (FTC ¶ 72.) Additionally, between June 15, 2005 and September 19, 2005, Oceanic transferred $113,500 to Send Hits Now LLC, a company owned by Sholes. (FTC ¶¶ 73-74.) Between April 28, 2005 and September 30, 2005, Oceanic transferred $90,000 to a company called Created LLC. (FTC ¶ 77.) Sholes was a signatory to the Created LLC bank account, and the company is owned by a business partner of Sholes. (FTC ¶¶ 78-79.) Oceanic continued to withdraw money from the savings account until this Court entered an order on October 6, 2005 "freezing the account in issue."

Oceanic brought suit against Cleverlink in the Superior Court of New Jersey, Ocean County Law Division. The Superior Court issued an order stating: "Default and Default Judgment is hereby entered against the Defendant Cleverlink Trading Limited in the amount of $370,000.00 on this 30th day of June, 2006. (Relief Ex. 12.)

## Procedural History

On May 16, 2005, this Court entered a temporary restraining order enjoining Cleverlink and the other Defendants from engaging in further violations of CAN-SPAM and freezing Defendants' assets. The TRO did not mention Oceanic specifically, but the asset freeze extended to funds owned, controlled or held by or for the benefit of any Defendant. On June 16, 2005, representatives of Cleverlink provided the FTC with sworn financial statements indicating that Oceanic was in

possession of approximately $370,000 of Cleverlink's funds.  On June 27, 2005, the FTC provided Oceanic a copy of the temporary restraining order freezing Cleverlink's assets.  On June 29, 2005, this Court entered the Stipulated Preliminary Injunction ordering Oceanic, by name, not to disburse any assets held on behalf of Cleverlink.

The FTC served Oceanic and Sholes with the Preliminary Injunction on June 30, 2005.  At that time, the FTC requested that Oceanic and Sholes provide the FTC with an accounting of all funds that they possessed on behalf of Cleverlink.  (Relief ¶ 9.)  On July 5, 2005, Sholes submitted a sworn statement that Oceanic held "$0.00 no available funds" on behalf of Cleverlink and that no assets held on behalf of Cleverlink had been removed from any account as of June 28, 2005 when he obtained notice of the injunction.  (FTC's Reply In Support Of Its Motion For Rule To Show Cause, Att. E.)  On September 16, 2005, Sholes certified a different "accounting" of Cleverlink's funds.  (FTC's Memorandum In Support Of Its Motion For Rule To Show Cause, Att. D.)  The certification stated that on or about April 20, 2005, Oceanic held $352,126.55 in Cleverlink funds. (*Id.*)  The certification continued, however, that Oceanic imposed chargeback fines and multi-factoring fees against these funds reducing the amount held as of June 27, 2005 to $36,326.55.  (*Id.*)  On October 3, 2005, the FTC filed a motion to preserve assets and for a rule to show cause as to why Oceanic should not be held in contempt of court.  With its Motion, the FTC attached bank records showing that since being served with the Court's order, Oceanic and Sholes had withdrawn over $175,000 from Oceanic's savings account.  In response, Sholes submitted a third "accounting" and declaration on October 26, 2005.  (FTC Ex. 5.)  This third accounting states that "[a]s of June 28, 2005, the date Oceanic received the Stipulated Preliminary Injunction, the total amount of funds possessed by Oceanic to which Cleverlink might be entitled was $16,606.98 (total receipts of

9

$517,168.80 minus the $136,539.54 transmitted to Cleverlink in April, minus $364,022.28 for fees and fines deducted by Oceanic)." (FTC Ex. 5, Att. A.)  The "accounting" itself was a one-and-a-half page summary created by Sholes.  (*Id.*)  The summary lists the funds received by Oceanic from Mercarse, the amount Oceanic then transferred to Cleverlink and the fees and fines deducted by Oceanic.  (*Id.*)  Sholes submitted no business records, account statements or other documents to support this summary.  (Oceanic's Opposition to FTC's Motion for Rule to Show Cause, Atts. 2-3.)

In light of the FTC's strong showing in support of its motion to show cause and the lack of documentary evidence from Oceanic, this Court gave Oceanic a short deadline to submit documents showing that the funds disbursed from its account rightfully belonged to someone other than Cleverlink.  In response to this January 11, 2006 order, Oceanic produced certain documents to support its imposition of fines and fees against Cleverlink's sales receipts.  Among the documents, Oceanic produced the MPPSA for the first time.  Following this Court's determination that it had personal jurisdiction over Oceanic and Sholes pursuant to the nationwide service provision in § 13(b) of the FTC Act, the matter was referred to Magistrate Judge Cole for further discovery and any hearing regarding whether Oceanic or Colin Sholes should be held in contempt of court for violating the preliminary injunction.

Based upon a thorough review and analysis of the evidence that the FTC and Oceanic submitted, Magistrate Judge Cole issued his Report and Recommendation.  Judge Cole first concluded that the MPPSA, executed electronically, governed the respective rights and obligations of Oceanic and Cleverlink.  (Report and Recommendation ("R&R") at 11-12.)  Additionally, Judge Cole concluded that Cleverlink's acceptance of Oceanic's services also bound it to the offered terms. Judge Cole then analyzed the documents that Relief Defendants submitted in response to this

Court's January 11 order in light of Sholes' prior declarations and the evidence provided by the FTC. Judge Cole began by noting the obvious inconsistencies in the separate declarations and accountings that Sholes submitted to the Court. (R&R at 13.) Judge Cole next conducted a detailed review of the documentary evidence, concluding that Relief Defendants' "purported 'business records' are so jumbled that they appear to be contrived" and "[t]he documentation Oceanic has offered on these critical questions ultimately is uninformative and indecipherable." (R&R at 14, 24.) When comparing Sholes' accountings of Cleverlink's funds to the evidence, Judge Cole found that "[the accountings] are hopelessly inconsistent with the only credible documentary evidence in the case" and "Oceanic's contrived presentation borders on spoliation." (R&R at 13, 25.) Ultimately, Judge Cole concluded that:

> In the instant case, the inconsistency and vacillation in the various stories told by Mr. Sholes in his contradictory declarations, the contrived nature of the documentary evidence that Oceanic has presented, and their failure to present meaningful and intelligible evidence – even though such evidence, if it existed, should have been easily producible – combine to compel the conclusion that the evidence is clear and convincing that Oceanic impermissibly transferred funds to itself and Mr. Sholes, knowing that such transfers were prohibited by the injunction.

Judge Cole recommended that Oceanic be held in civil contempt. (R&R at 30-31.) As a sanction, Judge Cole recommended that Oceanic return all monies taken after it had notice of the Court's orders and pay reasonable attorneys' fees or a fine. (R&R at 31.)

Relief Defendants object to Judge Cole's finding that clear and convincing evidence exists that they violated the Stipulated Preliminary Injunction by dissipating funds held on behalf of Cleverlink. Relief Defendants contend that Judge Cole clearly misread or did not understand the financial exhibits that supported their claims to the disputed funds. In an exercise of caution, this

11

Court allowed Relief Defendants' request for a hearing. Specifically, this Court instructed that "[d]uring the hearing, Mr. Sholes will be given an opportunity to explain the financial materials presented to the Magistrate Judge and to refute the Government's evidence that Oceanic violated Judge St. Eve's Preliminary Injunction order." At this Court's August 1, 2007 hearing, Sholes could not explain how the financial exhibits supported his claim that as of June 30, 2005, Oceanic had imposed chargeback fines and multi-factoring fees of $364,022.28 against Cleverlink's account. On direct examination, counsel for Relief Defendants did not ask a single question regarding the financial evidence that Judge Cole allegedly had misread and misunderstood. Relief Defendants' counsel instead asked questions about Oceanic's bank accounts, Oceanic's contract with Cleverlink and Oceanic's state court suit against Cleverlink. These questions were aimed at Relief Defendants' alternative theory that Oceanic held sole title to any funds deposited in the account maintained in Oceanic's name. Under this alternative argument, Cleverlink may have had a breach of contract claim against Oceanic, but Oceanic did not commit civil contempt by disbursing its own funds from its own bank account.

For its part, the FTC objects to Judge Cole's conclusion that Cleverlink agreed to the terms the MPPSA, electronically or otherwise. On this point, the FTC challenged Sholes regarding his evidence that Cleverlink accepted the MPPSA electronically. Next, the FTC used the documentary evidence, or often the lack thereof, to attack Sholes' contention that all of the fines and fees were imposed against Cleverlink prior to June 30, 2005. Finally, the FTC presented an investigator to explain Oceanic's and Sholes' various withdrawals and transfers from Oceanic's accounts. Upon questioning from the Court, Sholes admitted that his personal withdrawals in the amounts of $9,000 and $9,500 were intended to evade the requirement that they be reported to the IRS. (17:35.26.)

12

**Analysis**

All of the motions pending before this Court hinge, in part, on whether Oceanic holds or held any funds on behalf of Cleverlink. The cross-motions for summary judgment on Count VI of the FTC's Second Amended Complaint address whether Oceanic possesses profits of Cleverlink's unlawful activities and, if so, whether Oceanic has a legitimate claim to those funds. The FTC's motion for contempt against Oceanic and Relief Defendants' Motion for Summary Judgment as to its Compliance with the June 29, 2005 Stipulated Preliminary Injunction turn on whether Oceanic unlawfully disbursed any funds that it held on behalf of Cleverlink as of the date it received the Stipulated Preliminary Injunction – June 30, 2005.

## I. Cross-Motions for Summary Judgment

The parties have cross-moved for summary judgment on the FTC's claim (Count VI) seeking disgorgement of funds allegedly held by Relief Defendants on behalf of Cleverlink. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court considers cross-motions for summary judgment from a "Janus-like" perspective, examining each party's motion in turn and viewing all evidence and drawing all inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Equitable Power of the Court to Order Disgorgement

Relief Defendants contend that this Court may not order them to disgorge any funds because they are immune from liability under CAN-SPAM and the Adult Labeling Rule. The so-called immunity provision of CAN-SPAM provides that "[a] person that provides goods, services, property

13

or services to another person that violates [CAN-SPAM] shall not be liable for such violation" unless it has an economic interest in the violator or has knowledge of the violations. 15 U.S.C. § 7705(b)(1), (2). It is undisputed that Relief Defendants provided only a service to Cleverlink and did not have an economic interest in Cleverlink or knowledge of its violations. As such, Relief Defendants may not be held liable for Cleverlink's violations of CAN-SPAM. At the same time, it is immaterial that Relief Defendants cannot be found liable under CAN-SPAM because "[a] court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them." *S.E.C. v. Cherif*, 933 F.2d 403, 414 n.11 (7th Cir. 1991); *see S.E.C. v. Egan*, 856 F.Supp. 401, 402 n.3 (N.D. Ill. 1993) ("[F]or it is just as important to discourage illegal conduct by taking the proceeds of that illegality from those who have given no current value for the ill-gotten gains that have been turned over to them (even though they themselves have not directly engaged in the illegal activity)"). Thus, the material issues are whether Relief Defendants hold proceeds of Cleverlink's unlawful activities and whether Relief Defendants have a legitimate claim to those funds.

### B. Cleverlink's Unlawful Activities

Cleverlink did not admit to any violations in the Stipulated Order for Permanent Injunction and Final Judgment. The FTC introduces evidence of Cleverlink's violations of CAN-SPAM and the Adult Labeling Rule through the declarations of an FTC Paralegal, Douglas McKenney; a Program Manager for Microsoft (MSN) Hotmail, David Vetter; and a manager from LURHQ, a company that provides computer network security services, Brent Dylan-Rudy Deterding. McKenney describes the methods used and steps taken by the FTC to uncover evidence that

14

Cleverlink was responsible for sending numerous "spam" email messages. (FTC Ex. 3.) Vetter similarly describes the actions taken by Microsoft to collect "spam" email messages sent to its Hotmail trap message accounts, and that messages later traced to Cleverlink were copied and sent to the FTC. (FTC Ex. 9.) Deterding explains the general practices of "spammers" and his review of sample emails sent to him by the FTC. (FTC Ex. 12.)

During the month that Oceanic assisted Cleverlink to process credit cards, Cleverlink operated a variety of adult-oriented Web sites that advertised lonely housewives looking for discrete sexual liaisons. (FTC ¶ 37.) Cleverlink's Web sites were marketed via commercial email messages sent by affiliates hired by Cleverlink. (FTC ¶¶ 39, 41.) A typical spam message consisted of a short text message, often purportedly from a "lonely house wife," and a hyperlink. (FTC ¶ 42.) Consumers who clicked on the hyperlink contained in Cleverlink's spam messages were transported to one of Cleverlink's Web sites. (FTC ¶ 43.) At the Cleverlink sites, consumers could purchase access to a Web site membership by credit card. (FTC ¶ 38.) The Cleverlink spam disregarded the protections Congress provided in the CAN-SPAM in several ways. First, the commercial email messages employed at least three different techniques to falsify the header information of the messages; the messages included forged "from" and "reply-to" email addresses. (FTC ¶ 46.) The messages added arbitrary, false routing information and were routed through third party computers, thereby disguising the true origination point of the message. (FTC ¶¶ 47-48.) The commercial email messages marketing Cleverlink's Web sites also contained deceptive subject lines – such as "I forgot to tell you" or "Important reminder" – presumably aimed at tricking consumers into opening messages that they otherwise would delete. (FTC ¶ 50.) Many of Cleverlink's spam messages did not include any notification to recipients of their ability to decline receiving further

email messages from Cleverlink. (FTC ¶ 51.) Finally, the Cleverlink messages often failed to provide the sender's physical postal address. (FTC ¶ 52.)

Relief Defendants do not dispute the substance of these declarations. Relief Defendants' principal objection to the FTC's evidence is that the witnesses were not identified during discovery. Relief Defendants also point out that the evidence does not show that Oceanic knew of Cleverlink's violations nor does the evidence directly tie Cleverlink's violations to the funds transferred to Oceanic.

The FTC sufficiently complied with its obligation to identify Vetter, Deterding and McKenney to Relief Defendants. Vetter and Deterding, along with McKenney's predecessor, Theresa Bresnahan were identified in response to Relief Defendants' request for "[a]ll witness interviews, recorded statements, affidavits and declarations obtained in this matter." (Relief Ex. 14 at 14-15.) Additionally, each of these witnesses submitted essentially the same information in support of the FTC's prior motion for a temporary restraining order. Thus, Oceanic cannot claim undue surprise or prejudice from this evidence. As to Oceanic's legal arguments, this Court already has explained that Oceanic's knowledge of Cleverlink's violations is immaterial to the question of disgorgement. Second, the FTC is not obligated to tie each dollar of Cleverlink's credit card sales to a specific violation. It is enough that the funds are profits of Cleverlink's illegal activities. *F.T.C. v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997). Accordingly, the FTC has established through undisputed facts that Cleverlink violated CAN-SPAM and that the funds transferred to Oceanic from Mercarse were proceeds of that unlawful activity.

## C. Oceanic's Claim to the Funds

Oceanic received three payments from Mercarse totaling $517,168.80. (FTC ¶ 63.) Of this

16

total, Oceanic paid Cleverlink $136,539.54.  (FTC ¶¶ 64-65.)  Oceanic never transferred any of the remaining funds to Cleverlink.  (FTC ¶ 67.)  Relief Defendants present two arguments as to why they have a legitimate claim to these funds.  First, pursuant to Oceanic's contract with Cleverlink, Oceanic was entitled to assess certain chargeback fines and multi-factoring fees in addition to the general transaction and maintenance fees.  Second, Oceanic obtained a state court judgment conclusively establishing its right to the disputed funds.

### 1.    Oceanic's Contract With Cleverlink

The FTC asserts that Oceanic and Cleverlink never executed a written agreement and that the telephone conversation between Wickman and Sholes (Rich Doss) established the terms of the parties' agreement.  Relief Defendants contend that, following the telephone call, Cleverlink agreed electronically to the MPPSA and all of the terms in its exhibits.  Relying on the terms of the MPPSA, Sholes' third accounting lists $245,800 in chargeback fines ($100 per chargeback) and $70,000 in multi-factoring fines ($10,000 per violation).  Relief Defendants also contend that under the forfeiture provision in Exhibit G, ¶ 10(e), to the MPPSA, all funds became property of Oceanic at the time it closed Cleverlink's account due to excessive chargebacks.

The party seeking to rely upon the terms of a contract, bears the burden of establishing the contract's existence and its terms.[2]  *See Grow Co., Inc. v. Chokshi*, 2006 WL 3783519, *2 (N.J. Super. Ch. 2006), *citing Coyle v. Englander's*, 199 N.J. Super. 212, 223 (App. Div. 1985); *Liu v. T*

---

[2] The parties do not identify which state's law should apply to the question of contract formation.  Since the law relevant to this issue does not conflict among the states, this Court applies Illinois law.  *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) (holding that "courts do not worry about conflict of laws unless the parties disagree on which state's law applies"); *Vantassell-Matin v. Nelson*, 741 F. Supp. 698, 703 (N.D. Ill. 1990) ("If all interested jurisdictions (including the forum state) apply the same legal rule to any issue, the court should apply to that issue the law with which it is most familiar–that of the forum").

*& H Machines, Inc.*, 191 F.3d 790, 795 (7th Cir. 1990); *Reese v. Forsythe Mergers Group, Inc.,* 682 N.E.2d 208, 213 (Ill. App. 1997). A valid contract requires an offer, acceptance, and consideration. *Van Der Molen v. Washington Mut. Fin., Inc.*, 835 N.E.2d 61, 69 (Ill. App. 2005). Relief Defendants submitted a copy of the MPPSA to the Court in response the Court's January 11, 2006 order. (Colin H. Sholes' and Oceanic Telecommunications Services, LLC's Opposition to Rule to Show Cause and Personal Jurisdiction Order, Ex. B.) The submitted MPPSA is unsigned and lists Rich Doss as the representative for Oceanic. (*Id.*) Colin Sholes used the name Rich Doss when he dealt with Cleverlink. (16:24:28.) Explaining the unsigned contract, Relief Defendants assert that Cleverlink agreed to the terms of the MPPSA electronically. As proof of Cleverlink's electronic acceptance, Relief Defendants submit a January 20, 2006 email from Sholes to his attorney. (FTC's Objections to R&R, Ex. 7.) The email contains lines of computer code purportedly from Oceanic's server. (*Id.*) According to Sholes' email, the computer code lines show that an email was sent to Cleverlink on March 11, 2005 with information on the processing agreement. (*Id.*) Sholes' email asserts further that for Oceanic to process the application Cleverlink would have had "to click 'Accept' and done a digital signature on the resulting page." (*Id.*)

Without explanation, this Court cannot understand the lines of computer code in Sholes' email. Although Sholes stated in his email that the code lines came from Oceanic's servers, he had no first-hand knowledge regarding how and from where the code was retrieved. (16:30:38 - 16:32:14) Sholes also could not interpret the code lines and explain how they can be read to prove that an email was sent to Cleverlink with a link to the MPPSA. (*Id.*) Relief Defendants have provided no affidavit or testimony from anyone with actual knowledge of how and from where the code lines were retrieved. Likewise, there is no affidavit deciphering the lines of computer code.

18

Even if the lines of codes proved that an email was sent to Cleverlink, Relief Defendants still would be several steps from establishing that Cleverlink accepted the MPPSA submitted to the Court. First, there is no evidence that Cleverlink responded to the email or otherwise visited Oceanic's Web site. Sholes testified that any such evidence was deleted from Oceanic's servers before the FTC served Oceanic. (16:28:18 - 16:28:58) Second, there is no evidence that whatever document was linked in Sholes' email contained the increased chargeback fees or forfeiture provision in Exhibit G, ¶ 10. In this regard, Sholes did not retain a copy of the MPPSA and has indicated uncertainty regarding its exact terms. (FTC Ex. 4 at ¶ 35.) In the end, Relief Defendants have no competent evidence that Cleverlink electronically accepted the terms of the MPPSA. *See Senner v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir. 1997) ("A party needs more than a scintilla of evidence ... to defeat summary judgment").

The conduct of Oceanic and Cleverlink similarly does not prove that Cleverlink agreed to the terms in Exhibit G, ¶ 10. "It is standard contract doctrine that when . . . the offeree makes a decision to take the benefit *with knowledge of the terms of the offer*, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 385 (7th Cir. 2007), quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). A strong indicator that Cleverlink had agreed to the MPPSA's terms would be any correspondence or business records reflecting Cleverlink's knowledge of or Oceanic's enforcement of either the increased chargeback fines or the forfeiture provision. If Cleverlink continued to accept Oceanic's services without objection, such acquiescence could constitute acceptance of the terms. *See Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (silence may constitute acceptance). Although Cleverlink certainly accepted Oceanic's services and thereby

a contract was formed, there is no evidence that Cleverlink had knowledge of or agreed to the punitive terms in Exhibit G, ¶ 10.

In addition to the lack of evidence that Cleverlink agreed to the terms of the MPPSA, other evidence indicates that Cleverlink did not agree to the punitive terms in Exhibit G, ¶ 10. Wickman declares that he was never made aware of those terms during his telephone conversation with "Rich." (FTC Ex. 6, ¶ 3.) Relief Defendants do not contend that the forfeiture or increased fine provisions were discussed during the telephone conversation. Wickman also declares that no one at Cleverlink ever saw a copy of the MPPSA. (*Id.*) Moreover, an August 5, 2005 letter from Oceanic's attorney states that "[t]he business relationship between Oceanic and Cleverlink was never reduced to a signed, written agreement." (FTC Ex. 9, Att. A.) Even aside from this negative evidence, Plaintiff has not demonstrated a genuine issue regarding Cleverlink's acceptance of the increased fine and forfeiture provisions in Exhibit G, ¶ 10. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 235 (7th Cir. 1995). The undisputed facts demonstrate, however, that "Rich" and Wickman agreed to many terms, including certain charges, fines and fees for Oceanic's services, during their telephone conversation. (FTC ¶¶ 33, 34.) Some such fees were assessed in Oceanic's summary that it sent with its first remittance of funds to Cleverlink. It is black-letter contract law that the only enforceable terms of a contract are these terms – the ones to which both parties agreed.

## 2. State Court Judgment

On June 30, 2006, the Superior Court of New Jersey issued an order stating: "Default and Default Judgment is hereby entered against the Defendant Cleverlink Trading Limited in the amount of $370,000.00 on this 30th day of June, 2006." (Relief Ex. 12.) There is no other information

20

regarding the nature of the suit, Oceanic's allegations or the proceedings that occurred in the state court. Relief Defendants argue that, under the *Rooker-Feldman* doctrine, this Court is required to uphold and give force and effect to the June 30, 2006 default judgment entered by the New Jersey Superior Court.[3] *Rooker-Feldman* "is a narrow doctrine, confined to 'cases brought by state-court losers, complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005)). The *Rooker-Feldman* doctrine does not bar actions by non-parties to the earlier state court judgment, even if they could be considered in privity with a party to the judgment. *Lance*, 126 S. Ct. at 1202. Relief Defendants specifically contend that the state court judgment conclusively determined that Cleverlink entered into a binding contract with Oceanic. First off, it is not evident that the existence of a contract was necessary to the state court's judgment because neither Oceanic's allegations nor its cause of action for relief is before this Court. What is more important, however, is that the FTC was not a party to the state court action and the state court judgment was not entered before these proceedings commenced. Relief Defendants rely on the fact that Cleverlink "assigned and transferred to the [FTC] any and all legal or equitable rights, title and interest to proceeds of credit card transactions of customers of Defendant Cleverlink Trading Limited in the possession of the following third parties [including Oceanic]." The FTC though is not seeking disgorgement as a party standing in the shoes of Cleverlink, but rather through this Court's equitable power. Additionally, the state court judgment was not rendered before these

---

[3] Relief Defendants do not argue that collateral estoppel or res judicata precludes this Court's adjudication of the issue.

proceedings commenced or the FTC asserted its claim against Relief Defendants. For both these reasons, the *Rooker-Feldman* doctrine does not bar the FTC's claim for relief. *See Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994).

### 3. Amount of Funds to Which Oceanic Has a Legitimate Claim

Mercarse transferred a total of $517,168.80 to Oceanic. After deducting its fees, Oceanic paid $136,539.54 to Cleverlink on April 7, 2005. Pursuant to Sholes' account statements, after deducting its transaction and maintenance fees, Oceanic owed Cleverlink additional $344,629.26. Sholes admitted that Oceanic could not substantiate the $70,000 in multi-factoring fines listed in his accounting. (16:04:12.) The Mercarse report on Cleverlink's account lists 606 chargebacks in April 2005, 1048 chargebacks in May 2005, 355 chargebacks in June 2005 and 63 chargebacks from June 2005 through February 2006. (Joint Tr. Ex. 1.) Totaled, the chargebacks on Cleverlink's account equal 2072. (*Id.*) Assessed at the agreed rate of $25 per chargeback, Oceanic has a legitimate claim to $51,800 of the funds it received from Mercarse. As such, Relief Defendants have no legitimate claim to the remaining $292,829.26 in funds that were the proceeds of Cleverlink's unlawful activities.

## II. Civil Contempt

A person may not be held in civil contempt unless there is clear and convincing evidence that he violated an unequivocal command from the court. *U.S. v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001). This Court's order enjoined Oceanic from transferring, disbursing or dissipating any asset held on the behalf of Cleverlink. To be enforceable, an injunction must be "specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained." Fed. R. Civ. P. 65(d). In this regard, "[a]ll that is required ... is for the language of the injunction to be as specific as possible

under the totality of the circumstances, such that a reasonable person could understand what conduct is proscribed." *Medtronic, Inc. v. Benda*, 689 F.2d 645, 649 (7th Cir. 1982); *see Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995) ("If narrow literalism is the rule of interpretation, injunctions will spring loopholes")

Magistrate Judge Cole concluded that the evidence was clear and convincing that Oceanic impermissibly transferred funds to itself and Mr. Sholes, knowing that such transfers were prohibited by the injunction. Judge Cole recommended that Oceanic be held in contempt of court and, as a sanction, Oceanic be ordered to return all monies taken after it had notice of the Court's orders and to pay reasonable attorneys' fees or a fine. Oceanic and Sholes object to Judge Cole's finding that there is clear and convincing evidence that they violated this Court's order. First, they argue that Judge Cole misunderstood the financial exhibits that supported Oceanic's imposition of fines and fees against Cleverlink's funds. Alternatively, they contend that the funds generated by Cleverlink's credit card sales, transmitted from Mercarse and held in a bank account under Oceanic's name belonged to Oceanic and were not "an asset held on behalf of Cleverlink." The FTC objects to Judge Cole's conclusion that Cleverlink agreed to the MPPSA.

If a party objects to a magistrate judge's recommendation, the district judge "shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made...." Fed. R. Civ. P. 72(b). The district judge then "may accept, reject, or modify the recommended decision...." *Id.* For the reasons explained supra, this Court rejects Judge Cole's finding that Cleverlink agreed to the MPPSA. As to Oceanic's first objection, Sholes provided no testimony at this Court's hearing as to how the financial exhibits supported any of his declarations, particularly, how those exhibits supported his

23

claim that Oceanic imposed the chargeback fines and multi-factoring fees against Cleverlink's account prior to being served with the Stipulated Preliminary Injunction. Thus, having made a de novo review of the record before Judge Cole, this Court adopts Judge Cole's findings regarding the irreconcilable conflicts among Sholes' declarations, and between Sholes' declarations and the documentary evidence. This Court also adopts Judge Cole's conclusion that "the inconsistency and vacillation in the various stories told by Mr. Sholes in his contradictory declarations, the contrived nature of the documentary evidence that Oceanic has presented, and their failure to present meaningful and intelligible evidence – even though such evidence, if it existed, should have been easily producible – combine to compel the conclusion that the evidence is clear and convincing that Oceanic impermissibly transferred funds to itself and Mr. Sholes, knowing that such transfers were prohibited by the injunction."

Oceanic's second argument is that the money transferred and withdrawn from Oceanic's account after this Court's order belonged to Oceanic and not Cleverlink. That is, Cleverlink may have had a claim to the funds under a breach of contract theory, but the funds belonged to Oceanic at the time of the transfers and withdrawals. At this Court's hearing, Sholes gave no credible explanation for the substantial transfers and personal withdrawals made from the bank account. The Court believes that Sholes willfully dissipated the funds in an effort to put them beyond the knowledge or reach of the FTC and this Court.[4] Nevertheless, if the funds actually belonged to Oceanic, the transfers and withdrawals made by Oceanic and Sholes would not have violated this Court's order.

---

[4] Roughly $285,000 was withdrawn or transferred from the savings account between July 22, 2005 and October 5, 2005. (Joint Tr. Ex. 11, WCB0541-45.)

Sholes testified that Oceanic maintained two accounts under its name at Wachovia Bank. Sholes was the sole signatory on both accounts. He testified that neither account was a fiduciary or trust account and that neither account was maintained under Cleverlink's name. (15:22:36 - 15:23:04.) Oceanic had one other client. (16:41:52 - 16:42:20.) Oceanic placed funds it received on behalf of Cleverlink's sales as well as funds generated from its other client into the same account. (15:41:48 - 15:42:00.)

The relationship between Oceanic and Cleverlink demonstrates that Oceanic held the funds on behalf of Cleverlink.[5] In the August 5, 2005 letter to the FTC Sholes' attorney stated that "Oceanic acted as an intermediary for the transmission of charges and payments between BanKard and Cleverlink." (FTC Ex. 9, Att. A.) Sholes himself describes Oceanic's role as allowing clients "to process credit cards through the conduit of Oceanic and Mercarse." (FTC Ex. 1 at 34.) In *In re United Airlines, Inc.*, 368 F.3d 720, 722 (7th Cir. 2004), the Seventh Circuit examined the role of National Processing, a company that provides services similar to Oceanic's services. National Processing had a credit card merchant agreement with United Airlines. *Id.* at 722. National Processing argued that it made a "financial accommodation," a term of art in bankruptcy, to United by guaranteeing payment to the issuing bank and its customers if United could not cover any chargebacks resulting from cancelled flights. *Id.* at 722-23. Disagreeing, the Seventh Circuit described National Processing "as an intermediary" with no more a financial stake in the funds transmitted than "the Internet service provider through which data flows, the courier that moves

---

[5] There was not a statutory or express trust set up for the funds. *See, e.g.*, *In re McGee*, 353 F.3d 537, 540-541 (7th Cir. 2003) (describing some "hallmarks" of a trust); 50 Ill. Admin. Code § 3113.40(a) (requiring insurance brokers to maintain a premium fund trust account into which all premiums were to be deposited and held in a fiduciary capacity until the carriers demanded the premium payments).

25

paper records, the Federal Reserve wire-transfer apparatus, and the other contributors to a financial network." *Id.* at 723. Thus, National Processing functioned merely "as a conduit" for United's funds and collected a fee for its services which was "deducted from the balance remitted to the merchant." *Id.* at 722-23.

Oceanic characterizes Cleverlink's rights as contractual. Even were this Court to look to the MPPSA, that agreement calls for Oceanic to act as Cleverlink's agent in receiving, collecting and disbursing payments due Cleverlink.[6] (Relief Ex. 10 at ¶ 3.) The MPPSA also identifies Oceanic as Cleverlink's agent for purposes of processing its credit card charges through the merchant bank account (Mercarse) and managing those funds in a multi-client account maintained in Oceanic's name. (Relief Ex. 10 at Exhibit G, ¶¶ 3(c), 4(c).)

Oceanic acted as an agent for Cleverlink. In that capacity, Oceanic received payments due Cleverlink and served as an intermediary or conduit for processing through the receipts from Cleverlink's credit card charges. Given such facts, Oceanic did not have dominion over the funds transferred from Mercarse, but instead held them on behalf of Cleverlink. Therefore, Oceanic's and Sholes' willful conduct in transferring and withdrawing Cleverlink's funds from the bank account violated this Court's unequivocal command. Sholes was the primary officer of Oceanic and received a copy of the Court's order. (FTC Reply, Ex. E.) Sholes is the sole signatory on the Oceanic bank account (*see id.*, Att. D, Bresnahan Dec. ¶ 5(a), Ex. 1 at WCB001-3), and he personally withdrew $85,000 from the account after being served with the Court's asset preservation orders. (*id.*, ¶ 5(f),

---

[6] 3. Nature and Term of Engagement.

(c)     Agency. By entering into this Agreement, Client appoints Service Provider as its agent to perform Card Processing through any Payment Processing method included herein and further, . . . Client hereby grants a limited power of attorney to Service Provider authorizing Service Provider to invoice, receive, collect, and disburse all payment due Client.

Ex. 1 at WCB0057-58, 60-68.) As such, Sholes may be held jointly liable for contempt:

> It is well-settled that 'a command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.'

*Connolly v. J.T. Ventures*, 851 F.2d 930, 935 (7th Cir. 1988) (quoting *Wilson v. United States*, 221 U.S. 361, 376-77 (1911)). This Court finds Oceanic and Sholes in civil contempt of court. It would not serve as any deterrent merely to order Oceanic and Sholes to return the funds to which they had no legitimate claim in the first place. Because civil contempt sanctions are designed to compel compliance with a particular court order and to compensate the complainant for the loss caused by the contemptuous action, the fine must be based on evidence of actual loss. *See Autotech Technologies LP v. Integral Research & Development Corp.*, 2007 WL 2429480 at *13 (7th Cir. August 29, 2007). The complainant is therefore directed to submit to the Court within fourteen days of this order evidence of the actual losses incurred as a result of Oceanic's failure to comply with this Court's order; e.g. attorneys' fees and costs.

## Conclusion and Order

Wherefore, the FTC's Motion for Summary Judgment Against Relief Defendants is granted and Oceanic's and Colin H. Sholes' Motion for Summary Judgment as to Count VI is denied. Relief Defendants are ordered to disgorge the $292,829.26 in funds that are profits of Cleverlink's unlawful activities and to which they have no legitimate claim. This Court adopts in part and rejects in part Magistrate Judge Cole's Report and Recommendation on the FTC's Motion To Preserve Assets and For Rule To Show Cause As To Why Oceanic Should Not Be Held In Contempt Of Court. Oceanic

27

and Sholes willfully violated this Court's order not to disburse assets held on behalf of Cleverlink.

Wherefore, Oceanic's and Colin H. Sholes' Motion for Summary Judgment as to its Compliance with the June 29, 2005 Stipulated Preliminary Injunction is denied and the FTC's Motion To Preserve Assets and For Rule To Show Cause As To Why Oceanic Should Not Be Held In Contempt Of Court is granted [48].  Oceanic and Sholes are sanctioned for their contemptuous conduct in an amount to be determined by the Court at a future date based on evidence of loss to be submitted to the Court.  Together with the disgorgement order, Oceanic and Sholes are jointly and severally liable in the amount of $292,829.26 plus the amount of loss to be determined by the Court.

So ordered.

_____

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  September 28, 2007